UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Tiffany Cabrera, individually and on behalf of her infant children L.B., N.M., S.S., and M.S., and John Johnson,

          Plaintiffs,

— against —

The County of Nassau, Colleen Spatenga, Frances Defilippis, Cohen Children's Medical Center, Northwell Health, and Jonathan Golden,

          Defendants.

Case No. 25-CV-5838

COMPLAINT

JURY TRIAL DEMANDED

## NATURE OF THE ACTION

1.     This is a civil rights action, pursuant to 42 U.S.C. § 1983, seeking damages for Plaintiffs Tiffany Cabrera and John Johnson, parents falsely accused of shaking their beloved one-year-old daughter to death and for the wrongful separation of their family.

2.     Defendants, including Colleen Spatenga, a child protective services caseworker, and Jonathan Golden, child abuse pediatrician empowered to investigate allegations of child abuse in Nassau County, worked in collaboration to promote a knowingly incomplete and misleading narrative that painted Plaintiffs as abusive, violating their rights to family integrity and to be free from malicious prosecution.

3.     Despite substantial evidence that Plaintiffs' daughter, Empress, died tragically as the result of natural disease processes, Defendants ignored the clear etiology of Empress's symptoms and unreasonably claimed she was a victim of Shaken Baby Syndrome ("SBS") or Abusive Head Trauma ("AHT").

4.      SBS/AHT has been the subject of intense scrutiny for more than two decades, with numerous convictions overturned all over the country arising from faulty forensic science.

5.      The theory underlying SBS/AHT is that when an infant is shaken, the infant's brain will move within the skull, which will rupture the bridging veins that attach the brain to the membrane (dura mater) covering the brain.  When these bridging veins rupture, there will be immediate bleeding throughout the subdural brain space. These bleeds are called subdural hemorrhages or hematomas.

6.      The theory posits that when subdural hematomas are discovered in a baby's brain accompanied by two other findings – retinal hemorrhages and brain swelling – these findings suggest that a baby was almost certainly shaken.

7.      Contrary to what the medical community once believed, numerous studies conducted in recent decades have found that there are many natural illnesses in babies and young children that can account for these findings including birth trauma, bleeding disorders, infections, resuscitation efforts, and accidental injuries and falls.

8.      Indeed, Dr. A. Norman Guthkelch, credited with creating the SBS theory in 1971, said in 2012, "I think we need to go back to the drawing board and make a more thorough assessment of these fatal cases, and I am going to bet . . . that we are going to find in every – or at least the large majority of cases, the child had another severe illness of some sort which was missed until too late."[1]

---

[1] A recorded conversation conducted in 2012 with Dr. Guthkelch is available at https://onsbs.com/2014/08/20/conversations-with-dr-a-norman-guthkelch/.

9. Empress's autopsy would later confirm her death was the result of natural causes – from precisely the sort of severe illness that Dr. Guthkelch warned could mimic symptoms associated with SBS/AHT.

10. This case is not simply about the Defendants' dogmatic reliance on one diagnosis, SBS, while ignoring the change in this scientific area. Rather, it concerns their deliberate misconduct: despite having clear evidence – before Empress's death – that she had suffered no traumatic injury while in her parents' care, the Defendants concealed that evidence from the family court and knowingly advanced false claims of abuse against innocent parents.

11. Their actions led to the unjustified removal of Empress's four siblings from their mother and stepfather for nearly ten months.

12. Plaintiffs seek damages for the deprivation of their rights under the Fourteenth Amendment and for the deprivations of Infant Plaintiffs' rights under the Fourth Amendment of the United States Constitution.

13. This case begins with the tragic unfolding of every parent's worst nightmare.

14. On December 16, 2022, Empress, who had just turned one year old, woke up in the middle of the night and threw up.

15. Her mother, Ms. Cabrera, woke up with her, cleaned her up, soothed her, and got her back to sleep.

16. Ms. Cabrera was not surprised to see her daughter was sick; she had four other children between the ages of three and thirteen, and the flu had been cycling through their household.

17. Empress woke on and off throughout the night, but Ms. Cabrera was able to get her back to bed each time.

18. Around 5 a.m., Empress woke again and began acting strangely.

19. She let out a groan and her body stiffened and tensed up. Her eyes bulged and she appeared unresponsive.

20. Alarmed, Ms. Cabrera called 911.

21. Ms. Cabrera traveled with Empress by ambulance to the nearest hospital, while Mr. Johnson stayed home with the older children until their grandmother could get there.

22. When Empress arrived at Nassau University Medical Center ("NUMC"), hospital staff observed Empress having uncontrolled grand mal seizures.

23. During intubation, doctors struggled to establish an airway, though they eventually succeeded.

24. The doctors' efforts to revive Empress proved unsuccessful, and they began fearing for the worst.

25. Empress did not have any signs of injury on her body or head, but, given her unresponsiveness, doctors at NUMC sent her for a brain CT scan to see if there were any internal findings that could account for her condition.

26. The CT exam, done approximately two hours after Ms. Cabrera called 911 that morning, showed that Empress's brain was negative for any brain bleeds or other signs of trauma.

27. In other words, Empress did not have any subdural hematomas – the cornerstone of a SBS diagnosis.

28.     Indeed, under the theory of SBS/AHT, the subdural hematoma or bleeding occurs during the shaking event, therefore the absence of a subdural hematoma on a CT scan obtained within hours of the child's last contact with her parents effectively rules out shaking as the cause of Empress's symptoms and decline before she presented to the hospital.

29.     Empress's CT scan showed clear evidence of diffuse brain swelling – the result of hypoxic-ischemic injury (lack of oxygen to the brain).  Hypoxic-ischemic injuries result from the brain being deprived of oxygen for prolonged periods, such as extended, uncontrolled seizures.

30.     Empress's lab tests also confirmed she was positive for Influenza A.

31.     Once stabilized, Empress was transferred to Cohen Children's Medical Center ("CCMC"), the nearest trauma center, for more intensive intervention.

32.     At CCMC, Empress's condition continued to deteriorate.

33.     A second CT scan, performed on the afternoon of December 16, 2022, demonstrated high SWI (Susceptibility Weighted Imaging) markers on the right side of her brain, that is, evidence of deoxygenated blood in the brain.

34.     These SWI markers can sometimes be indicative of subdural hematomas but can also be a natural consequence of a hypoxic ischemic injury.

35.     Empress had no external injuries or signs of trauma, nor did she have a subdural hematoma when she received her first CT scan, and yet the supposed finding of a subdural hematoma on the second CT scan set off a chain of events that would lead the CCMC Director of Child Advocacy, Dr. Jonathan Golden, to claim that Empress had been violently shaken.

36. Empress's parents were at their child's bedside praying for her to survive, looking to the doctors for answers, when the DSS investigative caseworker, Colleen Spatenga, and Dr. Golden shifted the focus to Mr. Johnson and Ms. Cabrera for an explanation.

37. Other than the sudden onset of her flu symptoms, they had none.

38. The day Empress was taken off life support, DSS filed a petition in family court leveling allegations of severe abuse against Mr. Johnson and Ms. Cabrera and seeking the removal of Empress's four older siblings from their mother's and stepfather's care.

39. Based on DSS's claim that Empress's condition was necessarily the result of violent abuse, the family court judge granted the removal.

40. Rather than being able to grieve together as a family, Mr. Johnson and Ms. Cabrera spent the aftermath of Empress's death fighting abuse charges, with the threat of a criminal homicide investigation hanging over their heads.

41. Upon Empress' death, Ms. Cabrera was only allowed to see her children when supervised by her mother.

42. Mr. Johnson was not allowed to see them at all.

43. After seven months, the medical examiner's final comprehensive autopsy report confirmed that Empress died of natural causes, that is, from complications of the flu and other bacterial infections.

44. Indeed, the medical examiner found that several of the key injuries or findings that supported Dr. Golden's "shaken baby" diagnosis did not, in fact, exist at all.

45. Notwithstanding the unequivocal findings by the medical examiner that no one had abused Empress, DSS and Dr. Golden continued to pursue the severe abuse case in family court against Mr. Johnson and Ms. Cabrera for two more months.

46. Dr. Golden unreasonably spent that time working to challenge the superior postmortem examination.

47. Finally, on October 5, 2023, more than nine months after Empress died, DSS withdrew the case against Mr. Johnson and Ms. Cabrera and the children were finally allowed to return home.

48. Though reunited at last, the experience of being wrongfully accused and unnecessarily separated has left a profound and indelible mark on this family.

49. Plaintiffs bring this case to hold those who harmed them accountable and to prevent other families from facing knowingly false allegations.

## JURISDICTION AND VENUE

50. This action arises under 42 U.S.C. §§ 1983 and 1988.

51. Jurisdiction lies in this Court over claims against employees of the Nassau County Department of Social Services and its agent, Child Abuse Pediatrician Jonathan Golden, under its federal question and civil rights jurisdiction, 28 U.S.C. §§ 1331 and 1343.

52. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §§1391(b) and (c) as a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

53. Plaintiff Tiffany Cabrera ("Plaintiff Cabrera") is the mother of L.B., N.M., S.S., and M.S. ("Infant Plaintiffs") and is the mother of Empress, who passed away on December 22, 2022. Ms. Cabrera resided in Nassau County, New York during the events alleged in this complaint.

54. Plaintiff John Johnson ("Plaintiff Johnson") is the father of Empress, who passed away on December 22, 2022; he is the stepfather of Infant Plaintiffs. Mr. Johnson resided in Nassau County, New York during the events alleged in this complaint.

55. Infant Plaintiff M.S. is the older sister of Empress; M.S. was three years old when Empress died. She resided in Nassau County, New York during the events alleged in this complaint.

56. Infant Plaintiff S.S. is the older sister of Empress; S.S. was five years old when Empress died. She resided in Nassau County, New York during the events alleged in this complaint.

57. Infant Plaintiff N.M. is the older brother of Empress; N.M. was eleven years old when Empress died. He resided in Nassau County, New York during the events alleged in this complaint.

58. Infant Plaintiff L.B. is the older brother of Empress; L.B. was thirteen years old when Empress died. He resided in Nassau County, New York during the events alleged in this complaint.

59. Defendant The County of Nassau, New York ("The County") is a municipal organization under the laws of the State of New York.

60. Defendant Colleen Spatenga was employed during the years 2022 and 2023 by Nassau County Department of Social Services as a DSS caseworker. Defendant Spatenga is sued in her individual capacity.

61. Defendant Frances Defilippis was employed during the year 2022 by Nassau County Department of Social Services as the Assistant Director of Child Protective Services. Defendant Defilippis is sued in her individual capacity.

62.     Defendant Cohen Children's Medical Center ("CCMC") is part of Northwell Health. It is a non-profit corporation and sued in its capacity as a state actor and policymaker with regard to child abuse investigations conducted on behalf of the Nassau County Department of Social Services. CCMC was formerly known as Schneider Children's Hospital and also North Shore-LIJ Children's Hospital. CCMC shares a campus with Long Island Jewish Medical Center, and is located at 269-01 76th Ave, New Hyde Park, Queens County, NY 11040 and believed to be a domestic corporation.

63.     Defendant Northwell Health is New York State's largest health care provider and is the parent entity under which CCMC operates. Northwell Health was formerly known as "North Shore-Long Island Jewish Health System." Northwell Health is headquartered at 2000 Marcus Avenue, New Hyde Park, New York 11042 and believed to be a domestic corporation.

64.     Defendant Jonathan Golden is a medical doctor employed by Northwell Health and CCMC as a "child abuse specialist." Dr. Golden was employed during the years 2022 and 2023 as the Director of Child Advocacy and Clinical Forensic Medicine at CCMC in their Child Abuse Pediatrics Department, which is a partner of Nassau County Department of Social Services. Defendant Golden is sued in his individual capacity.

<div align="center">

**FACTUAL ALLEGATIONS**

</div>

**A. Background**

65.     This complaint centers on the tragic passing of one-year-old Empress, who died on December 22, 2022[2], and the wrongful prosecution of her parents in the aftermath of her death.

---

[2] Empress was declared brain dead on December 22, 2022, and that is the date of death listed on her death certificate; she remained on life support until December 27, 2022.

66. Before her passing, Empress lived at home in Nassau County with her mother, Tiffany Cabrera, her father, John Johnson, and her four older siblings – brothers L.B. and N.M., and sisters S.S. and M.S.

67. Empress, the baby of the family, was the only child in common between Ms. Cabrera and Mr. Johnson.

68. Ms. Cabrera and Mr. Johnson had met two years earlier, in April 2020 – at the height of the Covid-19 pandemic – at the 7-Eleven where Ms. Cabrera was working.

69. Just as Ms. Cabrera was a single mom of four children, Mr. Johnson was a single dad who had three children close in age to Ms. Cabrera's children.

70. Mr. Johnson's oldest daughter was the same age as N.M. and his youngest daughter was the same age as S.S. Mr. Johnson's three children lived with their mother, but they came to stay with him on weekends.

71. Mr. Johnson and Ms. Cabrera began dating and their relationship progressed quickly. In August 2020, Mr. Johnson moved in with Ms. Cabrera and her four children to Ms. Cabrera's two-bedroom apartment.

72. Ms. Cabrera's children were in touch with their fathers but did not see them regularly, thus Mr. Johnson became an active and involved father figure in their lives.

73. Mr. Johnson helped the boys with their homework, made sure they turned in their assignments on time, and gave them responsibilities around the home – like cleaning their room and loading the dishwasher.

74. Mr. Johnson, Ms. Cabrera and the children shared meals together, went to the park together, and spent time together as a family.

75.     Ms. Cabrera's children and Mr. Johnson's children hit it off quickly when they first met and developed deeper bonds over weekends they spent together.

76.     Mr. Johnson and Ms. Cabrera were married on January 30, 2021.

77.     In February 2021, Mr. Johnson and Ms. Cabrera moved with L.B., N.M., S.S., and M.S. to a three-story house that had more space, making it easier for Mr. Johnson's children to spend weekends together with the rest of the family.

78.     Not long after they moved into the new house, Ms. Cabrera became pregnant with their daughter, Empress.

**B. Empress's Birth and Medical History**

79.     Empress was born on November 23, 2021.  She was born full term, via spontaneous vaginal delivery, at six pounds, four ounces.

80.     Ms. Cabrera had planned for a home birth and arranged with a midwife to support her through the experience.

81.     The birth did not go as Ms. Cabrera had hoped.  She experienced complications during a long labor, was sick with Covid-19, and coughed with each contraction. Her blood pressure began to spike.

82.     After laboring at home for two days, Ms. Cabrera went to Mt. Sinai-South Nassau Hospital, where she delivered Empress.

83.     Empress was born healthy but stayed in the NICU for three days out of precaution to ensure she did not have any infections.

84.     On November 26, 2021, Ms. Cabrera and three-day-old Empress were discharged.

85. On November 27, 2021, four days after birth, Ms. Cabrera and Mr. Johnson took Empress to the pediatrician at CCMC for a newborn checkup.

86. Empress had a normal physical examination that day, passed her hearing tests, and weighed six pounds, six ounces.

87. On December 1, 2021, eight days after her birth, Ms. Cabrera and Mr. Johnson brought Empress back to the pediatrician for her scheduled follow-up appointment.

88. Again, Empress had a normal physical examination, was continuing to gain weight, and was up to seven pounds, one ounce.

89. Ms. Cabrera raised a concern about a swollen area she had noticed under Empress's nipple; the pediatrician did not, however, note any areas of concern.

90. Empress remained in good health and Ms. Cabrera and Mr. Johnson did not return to the pediatrician again until May 14, 2022, when Empress was five months old. On that date, Ms. Cabrera brought her in because she was concerned about a lump under Empress's right nipple. After examining her, the doctor confirmed a small pea-sized swelling under Empress's right nipple. The pediatrician recommended keeping an eye on it to make sure it did not grow but otherwise did not have any concerns.

91. Empress was eating well and appeared playful and alert during her five-month visit.

92. On August 2, 2022, the family attended the funeral of Ms. Cabrera's brother, who was 36 years old and suddenly passed away from heart failure.

93. At the funeral, Ms. Cabrera and Mr. Johnson observed Empress coughing and getting sick. When they got home, they called the pediatrician and made an appointment to bring her in for an examination the next day.

12

94. On August 3, 2022, the pediatrician examined Empress and confirmed that she had a fever of 103, was coughing and breathing rapidly, and appeared lethargic. The pediatrician recommended taking Empress to the hospital immediately, specifically Winthrop Hospital as it was two blocks away.

95. At Winthrop Hospital, Empress was diagnosed with Covid-19. She had a low white blood count and severe iron deficiency.

96. Mr. Johnson became upset at the treatment Empress received at Winthrop Hospital, as hospital staff poked Empress's arm several times before successfully getting an IV in; staff were generally unresponsive and did not regularly check on Empress while she was there.

97. Mr. Johnson complained about the staff's treatment of his daughter and told staff at Winthrop that he would sue them for not treating his baby appropriately.

98. Because they were concerned about the staff's treatment of their daughter, Mr. Johnson and Ms. Cabrera decided to have Empress discharged from Winthrop and transferred to CCMC.

99. After Mr. Johnson complained of Winthrop's mistreatment of his daughter, Winthrop staff called in a report to the State Central Register making allegations that Empress's parents had failed to ensure she received proper medical attention.

100. At CCMC, Empress received better treatment and her condition improved.

101. She received iron transfusions to help with her anemia and was diagnosed with a bacterial urinary tract infection, for which she was prescribed oral antibiotics.

102. DSS caseworkers assigned to investigate the report made by Winthrop Hospital came to CCMC while Empress was hospitalized there.

103. Ms. Cabrera and Mr. Johnson cooperated with the investigation by explaining the source of their frustration and complaints about Winthrop Hospital. The caseworker spoke with staff at CCMC, who confirmed they had not had any issues with the parents who were cooperative with Empress's medical treatment.

104. Empress was discharged from CCMC on August 8, 2022, with instructions to take ferrous sulfate for her anemia and cefpodoxime, an antibiotic, to treat her urinary tract infection.

105. On August 9, 2022, Mr. Johnson and Ms. Cabrera brought Empress to the pediatrician for a post-hospitalization follow-up visit.

106. Over the next two months, a DSS caseworker continued her investigation. She made home visits and found the children were well cared for, and there were no concerns about the home or sleeping arrangements.

107. The caseworker also spoke with the children's pediatrician and confirmed that the older children had all been seen for wellness checks and were doing well.

108. On August 24, 2022, approximately three weeks after Empress had been hospitalized with Covid, Mr. Johnson and Ms. Cabrera brought her to the doctor again – this time because they had observed a lump on her right thigh and wanted the doctor to check it out. The pediatrician confirmed it was likely a healing bug bite and there was no evidence of other infection or injury.

109. At her appointment that day, it was confirmed that Empress was still taking the antibiotic she had been prescribed to treat the urinary tract infection that was detected during her hospitalization.

110. On September 12, 2022, Mr. Johnson and Ms. Cabrera returned with Empress to the pediatrician for her 9-month well check.

111. The doctor examined the lump on Empress's thigh and confirmed it was smaller in size but still present. Empress was not on any medications at that time and no recommendations for medications were made.

112. During Empress's 9-month checkup, she weighed 21 pounds, 14 ounces, putting her in the 91st percentile for weight for her age.

113. On October 5, 2022, after 60 days of investigating the allegations made by Winthrop Hospital staff, DSS marked the report as "unfounded," meaning the allegations of inadequate medical attention were not substantiated against Mr. Johnson or Ms. Cabrera.

## C. Empress's Medical Condition on December 16, 2022

114. On the night of December 15, 2022, Ms. Cabrera and Mr. Johnson were at home with Empress and the four older children.

115. L.B., who was thirteen years old, had been sick with the flu for several days, but was starting to improve. N.M. was also sick with the flu, so both boys had been home from school for the past few days.

116. In the early hours of the next morning, December 16, 2022, Empress woke up crying in the middle of the night and threw up. Empress was still sleeping in a crib in her parents' room and Ms. Cabrera cleaned her up and rocked her back to sleep.

117. Ms. Cabrera was not overly surprised to see Empress was sick as her sons had been sick with the flu for several days. She assumed Empress was the next one coming down with the virus. Ms. Cabrera went back to sleep after getting Empress back down.

15

118.     After that, Empress woke up periodically, sick, but Ms. Cabrera was able to soothe her and get her back to sleep.

119.     Sometime after 5 a.m., Empress woke up again.  This time, she let out a groan and appeared uncomfortable.

120.     She tensed up and, shortly after, became unresponsive.  Her eyes seemed to swell up and she was just staring blankly.  She was also struggling to breathe.

121.     Ms. Cabrera and Mr. Johnson became alarmed, and at 5:29 a.m., Ms. Cabrera called 911.

122.     Ms. Cabrera reported to dispatch that Empress's eyes appeared swollen and she was screaming in pain.

123.     She told 911 that her sons had the flu, and requested an ambulance come as soon as possible.

124.     Nassau County Police Department officers arrived first and began asking questions.  The paramedics arrived a few minutes later, at approximately 5:40 a.m.

125.     Nassau County Police Department emergency medical service workers (EMS) observed Empress unresponsive with snoring respirations, posturing of both arms, flexed legs, and marked seizure activity.

126.     They prepared to transport her to the nearest hospital, Nassau University Medical Center ("NUMC"), and Ms. Cabrera went with them.

127.     Mr. Johnson stayed back at the house with the older children and tried to reassure them that their baby sister would be okay.

128.     He waited for Ms. Cabrera's mother to arrive at the house, and then he left to join Empress and Ms. Cabrera at NUMC.

**D. Empress's Hospitalization at Nassau University Medical Center (NUMC)**

129. At 5:52 a.m., the EMTs left the Cabrera-Johnson home to transport Empress to the hospital. Ms. Cabrera rode in the back of the ambulance with Empress.

130. Inside the ambulance, Ms. Cabrera became alarmed at the EMS workers' rough treatment of Empress.

131. The EMS workers were attempting to place an adult-sized oxygen mask over her baby's face.

132. Empress seemed to be in pain and was continuing to tense up and struggle to breathe.

133. The EMS workers became frustrated with Ms. Cabrera and accused her of interfering with their care of Empress.

134. They arrived at NUMC at 6:04 a.m., and transferred Empress to the care of NUMC staff at 6:07 a.m.

135. At NUMC, staff observed Empress experience "grand mal seizures," meaning she was experiencing full body contractions and had lost consciousness.

136. At 6:16 a.m., NUMC hospital staff gave Empress 1mg of Ativan IM, and she showed some improvement for 2 to 3 minutes. However, she then began seizing again.

137. The staff administered another dose of Ativan 1mg at 6:28 a.m.

138. Ms. Cabrera was terrified watching hospital staff trying to probe her baby with needles to insert an IV. She did not yet understand what was happening to her child or that Empress was in *"status epilepticus."*

139. At 6:41 a.m., a nurse eventually succeeded in placing the IV.

140. Empress was experiencing acute respiratory failure and was intubated for emergency airway protection at 6:55 a.m. and placed on a ventilator.

141. Empress was critically ill and unable to be aroused.

142. Due to the EMS workers who raised concerns about Ms. Cabrera's supposed interference with their treatment of Empress, NUMC hospital staff evaluated Empress for possible signs of abuse.

143. Her body was examined for injuries, and there was no evidence of trauma anywhere. Hospital staff noted they observed no findings on Empress to suggest she had been neglected or abused.

144. Once intubated, NUMC sent Empress for a head CT, which was completed at 7:19 a.m.

145. The CT scan of Empress's head showed no acute intracranial hemorrhages (subdural hematomas) or extra-axial collections, confirming that approximately two hours after Empress's parents called 911, and one hour and forty minutes after she was last alone with them, Empress did not have any brain bleeds or skull fractures.

146. Though Empress's head CT did not show any bleeds, there were signs that her basilar cisterns were narrowing, showing early evidence of diffuse brain swelling.

147. A CT scan of Empress's chest was also completed at 7:49 a.m., which did not show any signs of injury.

148. Given Empress's critical condition, NUMC requested that Empress be transferred to CCMC, which has a pediatric trauma center designed to treat children with potentially life-threatening conditions.

149. At 8:40 a.m., Empress was transferred to CCMC.

18

150. At 8:57 a.m., Empress's test came back positive for Influenza A.

**E. Empress's Hospitalization at CCMC**

151. Empress was intubated and unresponsive upon her admission at CCMC on December 16, 2022.

152. She developed tachycardia with unstable blood pressure and was found to have reduced cardiac functioning.

153. An ultrasound of Empress's heart showed it was enlarged and pumping poorly – only about 25% of the normal amount with each beat. One of the heart valves was leaking moderately.

154. The doctors believed the heart's weakness could be due to myocarditis, which is inflammation of the heart muscle, likely triggered by her Influenza A infection.

155. Empress's blood tests also showed a very high white blood count, consistent with her body fighting a significant infection.

156. Her urine test was also positive for infection, indicating a possible urinary tract infection. A blood culture would later confirm that Empress had a significant E coli infection.

157. The CT scan of Empress's chest showed her lungs appeared hazy, potentially indicating fluid or mucus.

158. At 3:28 p.m., a CT scan was performed of Empress's brain.

159. The CT scan report indicates that there was diffuse effacement of the sulci and gyri, and the gray-white matter appeared effaced, confirming diffuse cerebral edema and widespread hypoxic-ischemic injury.

160. A hypoxic-ischemic injury happens when the brain does not get enough blood flow and therefore oxygen for a period of time; without enough oxygen, brain cells start to die, leading to swelling and brain tissue damage.

161. This deprivation of oxygen and resulting hypoxic-ischemic brain injury can be caused by prolonged seizures, cardiac arrest, or severe breathing problems.

162. The CT scan also revealed tonsillar herniation, meaning that the swelling was forcing the brain to push down through the base of the skull, which is life-threatening.

163. Though signs of diffuse brain swelling were clearly present, there was no midline shift of the brain and no hydrocephalus indicated.

164. Taken together, these findings indicate diffuse brain swelling, consistent with prolonged oxygen deprivation or seizures, rather than localized trauma.

165. The CT scan report from 3:28 p.m. showed SWI markers indicated a hyperdensity along the right occipital convexity (the surface of the right back side of the brain), which could be consistent with an acute subdural hematoma, measuring approximately 3mm.

166. Given the severe brain swelling noted on her brain scan, and the lack of neuroactivity, Empress's prognosis was grim.

167. After the possible subdural hematoma was detected, Dr. Jonathan Golden was referred to the case to evaluate concerns of non-accidental trauma.

168. In the days following her admission, while pursuing tests to confirm brain death, CCMC staff shifted their focus away from the presence of viral and bacterial infections and, instead, suspected her brain findings were caused by trauma of an abusive nature.

169. The ophthalmologist who examined Empress clinically on December 16, 2022, indicated that Empress had retinal hemorrhages in both eyes, which can be caused by nonaccidental trauma.

170. However, at autopsy, the neuropathologist found that Empress had "congested retinal vessels, but no hemorrhage in either eye."

171. On December 19, 2022, an MRI was also conducted of Empress's brain, which revealed widespread hypoxic-ischemic injury.

172. The report indicated that the degree of swelling and herniation appeared consistent with the CT scan taken on December 16, 2022.

173. On December 19, 2022, an MRI was conducted of Empress's spine. The MRI showed, among other things:

a. severe swelling of Empress's spinal cord from C1 to C7;

b. stretching or tearing to the soft tissue and ligaments at the very top of Empress's spine along C1 and C2;

c. Tonsillar herniation (which had been previously detected during the CT scan), confirming that Empress's brain was still being pushed down through the opening of the base of her skull, because of the severe swelling to her brain;

d. small compression injuries in the upper back bones, but no dislocation of the spinal cord;

e. increased STIR ("Short Tau Inversion Recovery") signal in the C6, C7, T1 and T2 vertebral bodies which the radiologist indicated likely reflected minimal compression fracture deformities; and

f. a possible lung infection in Empress's right lung.

174. Though the above findings were entirely consistent with the tragic but natural progression of Empress's brain swelling over a period of days due to the hypoxic-ischemic injury, Dr. Golden found that Empress's alleged neck compression fractures were evidence of abuse, rather than a natural disease process.

175. At autopsy, like the retinal hemorrhages, it was again confirmed that Empress did not, in fact, have any fractures to her neck or anywhere else on her body.

176. On December 20, 2022, a skeletal survey was conducted of Empress's chest, abdomen, pelvis, and spine. The results confirmed that Empress had no evidence of new or old fracture or injury anywhere on her body, including spine, ribs, or extremities.

177. On December 21, 2022, Dr. Golden provided a consultation report concerning Empress's condition, acknowledging that some of the medical findings are consistent with her testing positive for Influenza A and having prolonged seizure activity, which necessitated intubation.

178. Nevertheless, without further considering and investigating the Influenza A as a possibility for Empress's findings, Dr. Golden concluded that there was a substantial concern for undisclosed trauma and that the child protective services team involved in the investigation should be updated with this information.

179. On December 22, 2022, at 4:43 p.m., Empress was pronounced brain dead, though she remained on life support until December 27, 2022. Her mother and father were with her at the time she was pronounced and the time she was taken off life support.

**F. DSS Investigation**

180. On December 16, 2022, at 10:00 a.m., a report was called in to the New York State Central Register of Abuse and Maltreatment ("SCR") falsely alleging that Ms.

22

Cabrera delayed seeking emergency medical treatment for Empress and interfered with EMS's attempts to provide oxygen to Empress.

181. The report alleged that Ms. Cabrera's failure to obtain medical care earlier contributed to Empress's critical medical condition.

182. The report further stated that Empress was suffering from seizures when she was admitted to NUMC and that she was at risk of permanent impairment or death because of the severity of her medical condition.

183. The report noted that a CT scan had been done and revealed no brain injuries.

184. On December 16, 2022, DSS assigned caseworker Colleen Spatenga to investigate the SCR report.

185. Ms. Spatenga called the source of the report and was told that Empress was having seizures and claimed that Ms. Cabrera delayed seeking medical treatment.

186. The source told Ms. Spatenga that Empress's brain CT scan at NUMC came back negative, and once she had been stabilized, she had been transferred to CCMC.

187. Ms. Spatenga reached out to Detective Mosquera, of the Nassau County Police Department, who was also assigned to investigate the report.

188. Detective Mosquera informed Ms. Spatenga that he had already spoken to a doctor at CCMC who told him that they did not suspect foul play, as everything appeared normal.

189. Detective Mosquera agreed to meet Ms. Spatenga at CCMC so that they could interview the family members together.

190. Meanwhile, DSS caseworker Deice Acevedo was assigned to begin investigating the wellbeing of Empress's siblings.

191. Ms. Spatenga met Detectives Mosquera and Occhino at CCMC and learned from hospital staff that Empress was not doing well.

192. Empress had fluid around her heart and the medical staff was worried she would go into cardiac arrest.

193. The staff further reported that Empress had tested positive for the flu. Hospital staff informed Ms. Spatenga and the detectives that Empress's siblings also had the flu.

194. Ms. Spatenga and the detectives met with Ms. Cabrera and Mr. Johnson in the common room, as they could not be inside Empress's hospital room while she was being prepared for an Extracorporeal membrane oxygenation (ECMO) life support procedure.

195. Ms. Cabrera and Mr. Johnson were confused why law enforcement was present when they just learned from the doctors that Empress had the flu which was causing her heart to fail.

196. They asked the detectives why they were involved when there was no evidence of trauma, and it was clear their child was suffering from a virus that was impacting her health.

197. The detectives apologized and assured them that they get called to the hospital constantly and had no reason to believe Mr. Johnson or Ms. Cabrera did anything wrong.

198. One of the detectives complained that hospitals call law enforcement too much these days. The detectives offered their apologies and hopes that Empress would recover.

199. Ms. Spatenga asked Ms. Cabrera what had happened leading up to Empress's hospitalization.

200. Ms. Cabrera walked her through the timeline of events, explaining how she had been caring for her daughter throughout the night and the subsequent medical interventions.

201. Ms. Cabrera was frustrated speaking to the detectives and told them that the last time she had brought Empress to that hospital (when Empress had Covid in August 2021), DSS had been called on her.

202. She did not understand why every time she tried to get medical treatment for her child she was accused of neglect.

203. Ms. Cabrera expressed alarm at the volume of medications pumped into her child, the aggressive efforts to force an IV in her child at NUMC, and the threat from medical staff to remove her if she interfered with their treatment.

204. The detectives reassured Ms. Cabrera and Mr. Johnson that there was no need for them to be there, and they believed what Ms. Cabrera and Mr. Johnson were saying.

205. Ms. Spatenga asked where the older children were. Ms. Cabrera told her that they were at her mother's house.

206. Ms. Spatenga explained that the report alleged that Ms. Cabrera failed to call 911 fast enough as Empress was having seizures at 3 a.m., but that Ms. Cabrera did not call until 5:30 a.m.

207. Ms. Cabrera explained that at 3 a.m., she did not know her daughter was having seizures – she had seen her tensing up but did not know what was happening. She explained that she called 911 as soon as she realized that Empress was unresponsive.

208.   On December 16, 2022, while Ms. Spatenga was at the hospital with Ms. Cabrera and Mr. Johnson, Ms. Acevedo made a home visit to Ms. Cabrera's mother's home where the older children were staying.

209.   The children's grandmother told Ms. Acevedo that she had been with Empress and Ms. Cabrera the day before, and Empress was fine, seemed happy, and in good health.  She said she was clapping her hands and smiling.

210.   The children's grandmother told Ms. Acevedo that she often helps care for the children and sees the family.  She denied that anyone would intentionally harm Empress and shared that Mr. Johnson is a good man and overprotective, especially with Empress.

211.   The children's grandmother shared that the older children's fathers are not very involved.  She confirmed there were no issues of domestic violence, substance use, or mental health concerns for Ms. Cabrera or Mr. Johnson.

212.   Ms. Acevedo observed L.B. and N.M., laying on the floor playing video games.  Both boys told Ms. Acevedo they had been sick with the flu for the past few days and had not gone to school.

213.   L.B. told Ms. Acevedo that he was in middle school, doing well academically, and in wrestling.  N.M. told her he was doing well in school as well and liked writing.  Both boys told Ms. Acevedo they had no concerns at home and did not understand why their sister Empress was in the hospital, though she could have caught the flu.

214.   They confirmed their mother and stepfather do not use any corporal punishment and said that they discipline them by taking their video games away.

215.   They told Ms. Acevedo they go to the pediatrician for check-ups and their medicals are up to date for school and sports.

26

216. Ms. Acevedo observed both boys to be free from any bruises, marks, or other injuries.

217. Ms. Acevedo also interviewed the girls S.S. and M.S. and observed them to be well and free from any marks or bruises.

218. She left the children with their grandmother.

219. On December 19, 2022, Ms. Spatenga spoke with the hospital child abuse social worker Kathy Adams by phone, who told her that Empress had multiple retinal hemorrhages in both eyes and subdural hematomas.

220. Ms. Adams said that it is consistent with non-accidental trauma and that they were consulting with Dr. Golden.

221. Ms. Adams told Ms. Spatenga that the attending doctor stated that the flu could be causing some of Empress's symptoms, but they need to get more information.

222. Ms. Adams told Ms. Spatenga that Dr. Golden was requesting that Empress have an MRI done before performing the brain death criteria; however, the ICU team treating Empress supported completing the brain death criteria, rather than performing the MRI.

223. On December 20, 2022, Ms. Spatenga called Dr. Golden and spoke with him by phone. Dr. Golden told Ms. Spatenga he had significant concern for inflicted injury as there is dramatic injury to Empress's spinal cord which would be the result of an inflicted injury.

224. Dr. Golden told Ms. Spatenga that the cause of that injury is the whipping of the head back and forth.

225. Dr. Golden told Ms. Spatenga that he was not sure why the CT scan at NUMC would not have come up with anything. He told Ms. Spatenga he was waiting to speak

with the ophthalmologist and the neurologist and that he would review the NUMC CT results with them once he received the paperwork from NUMC.

226. On December 20, 2022, Ms. Spatenga arranged for Ms. Cabrera's four older children – L.B., N.M., S.S., and M.S. – to have forensic interviews conducted at the CAC.

227. The boys' forensic interviews were conducted by ADA Debra Bresnahan and observed by Ms. Spatenga, Detective Mosquera, and forensic team member Marissa Blinder.

228. The girls' interviews were conducted by Marissa Blinder and observed by Ms. Spatenga and ADA Debra Bresnahan.

229. All the children were verbal, answered the questions, and denied anyone had harmed their sister Empress.

230. L.B., who was in eighth grade, told Ms. Bresnahan that he had been sick with the flu and trying to keep to his room to avoid getting anyone else sick; however, he had seen Empress the day before she was hospitalized – Thursday, December 15, 2022 – and she had seemed like her normal self.

231. Because he and N.M. were both sick on December 15, they had stayed home from school.

232. The family had dinner together that night and Empress sat in her highchair, drinking her bottle.

233. L.B. told Ms. Bresnahan that that evening, they had vegan sloppy Joe's, but his stomach was still upset from the flu, so he did not have much of an appetite and ended up throwing up later. It was otherwise a quiet, uneventful evening.

234. L.B. said that Empress does not climb out of her crib and has never fallen off the bed. He said everyone always makes sure Empress is safe, and the only time she had ever gotten hurt was when she had grabbed their family cat's tail and he scratched her.

235. L.B. said he learned from his stepfather the following morning that Empress had gone to the hospital with seizures, and that he has been staying with his grandmother since then.

236. L.B. confirmed he is never physically disciplined; his mother disciplines him and his siblings by taking away games and video games or not allowing them to go out with friends.

237. N.M., who was in sixth grade, spoke with Ms. Bresnahan next. N.M. also shared that he had been sick with the flu before Empress's hospitalization.

238. N.M. told Ms. Bresnahan that the night before Empress was hospitalized, he and his brother L.B. were watching Empress while their mother was cleaning up the house and their stepfather was cooking dinner. Empress was crawling around and seemed like her normal self.

239. N.M. said he went to bed around 9 p.m., and the next morning when he woke up, his brother L.B. told him their mother had taken Empress to the hospital with seizures. N.M. confirmed he did not hear any yelling, fighting, or crying in the night.

240. N.M. said that Empress did not fall and no one had hurt her – he could not think of anything that could have hurt Empress.

241. N.M. told Ms. Bresnahan that he is not physically disciplined. His mother disciplines them by taking away games or sending them to their rooms.

242. Marissa Blinder conducted the forensic interview of S.S, who was in kindergarten at the time.

243. S.S. told Ms. Blinder that her little sister Empress is always happy but is fighting for her life at the doctor's.

244. S.S. told Ms. Blinder that when she does not listen, Mr. Johnson takes away her television or her mother takes her to have a bath.

245. She told Ms. Blinder that Empress never gets into trouble as she's just a baby, and there was never a time that Empress got hurt.

246. Ms. Blinder interviewed three-year-old M.S. last. M.S. told Ms. Blinder that her sister Empress was at the doctor's and sleeping there, but she did not know why.

247. On December 20, 2022, Ms. Spatenga spoke with Ms. Adams who told her that Empress's parents wanted a second opinion as they think that her condition was caused by COVID or something that happened on the way from NUMC to CCMC.

248. They were hoping to get a skeletal survey done.

249. Ms. Adams told Ms. Spatenga the parents were stalling and trying to avoid the brain death criteria from being completed.

250. On December 21, 2022, Ms. Adams called Ms. Spatenga to tell her that the parents are still opposed to completing the brain death criteria as they did not want to take Empress off life support.

251. Ms. Adams said that Dr. Golden was going to be reviewing the ophthalmology pictures as he wanted to see if the retinal injuries were classic shaken baby or fall injury, but that this is more likely inflicted injury.

252. Ms. Adams said that the NUMC CT scan would be read by a neuroradiologist, Dr. Alan Johnson from LIJ, as it was not read by an experienced doctor at NUMC.

253. On December 21, 2022, the day after the children were seen at the CAC, Ms. Spatenga, visited Ms. Cabrera's mother's home to meet with the grandmother and Empress's four siblings.

254. The children's grandmother told Ms. Spatenga that she does not understand why the parents are being accused of shaking Empress – she had just seen Empress the day before she was hospitalized, and she was clapping and happy.

255. The children's grandmother told Ms. Spatenga that Ms. Cabrera would never do anything to harm Empress and that Mr. Johnson is attached to Empress.

256. Ms. Spatenga observed the children in their grandmother's home.

257. On December 22, 2022, Dr. Golden told Ms. Spatenga that there are clear signs of trauma that are not being disclosed and clear signs of shaken baby syndrome, though he admitted he could not say if it is shaken baby syndrome.

258. Dr. Golden told Ms. Spatenga Empress had trauma, but he could not say if it was accidental or inflicted. He stated these signs are not likely to be the results of a medical condition.

259. On December 22, 2022, CCMC radiologist reviewed the NUMC CT scan results and confirmed there was no subdural hematoma, but the CT scan was abnormal as there were visible signs of brain swelling. Ms. Adams relayed these findings to DSS.

260. On December 22, 2022, after Empress was pronounced dead, DSS filed an application in Nassau County Family Court pursuant to Family Court Act 1022, seeking a pre-

31

petition temporary removal order of L.B., N.M., S.S., and M.S., based on the allegations that Empress's condition was caused by abuse.

261. The family court judge granted DSS's request to remove the four children and temporarily placed them in the care of their maternal grandmother. A temporary order of protection was issued against Ms. Cabrera and Mr. Johnson on behalf of the children, prohibiting any contact except visitation approved by DSS.

262. The family court judge directed DSS to file petitions by December 28, 2022, and scheduled a removal hearing for December 29, 2022.

263. On December 27, 2022, Empress was taken off life support and the epinephrine infusion ran out, which caused her heart to stop.

264. After Empress was taken off life support, the matter was transferred from the assigned SVU detective to the homicide unit for further investigation.

265. Empress's body was transferred to the Queens Medical Examiner's Office on December 28, 2022, and arrived at 1:41 p.m.

266. At 4:59 p.m. on December 28, 2022, the Medical Examiner Gina Prochilo spoke to Detective Carroll.

267. The autopsy was completed on December 29, 2022, at 6:33 a.m.

268. At 1:20 p.m. on December 29, 2022, the Medical Examiner called Ms. Cabrera.

269. Ms. Cabrera was given the number to the forensic pathology coordinator for "preliminary findings," but it was explained that it could take 3-6 months for determination of final cause of death.

270. Upon information and belief, the preliminary findings were clear that there were no signs of abuse, and no subdural hematoma was present in Empress's brain.

271. Post-mortem autopsy is the gold standard for determining the cause of death as it relates to brain and neck findings.

272. It would have been immediately apparent to the Queens' Medical Examiner that no head trauma was present in Empress.

273. The Medical Examiner spoke with Defendant Spatenga at 1:57 p.m. on December 29, 2022, to go over the information revealed in the autopsy.

274. According to forensic pathology best practices, brain and retinal gross findings are available immediately, and families and investigators usually get an oral update the same day.

275. Gross findings regarding subdural hematomas and other areas of the brain and neck are revealed in the early steps of an autopsy when the brain is removed from the skull and the dura – one of the protective layers of the brain – is peeled off to begin the autopsy.

276. Upon information and belief, Dr. Prochilo did not observe any subdural hematomas when she conducted her initial autopsy findings.

277. Similarly, Dr. Prochilo observed rare possible retinal hemorrhages in her initial autopsy findings; upon information and belief these are not the type or quantity of retinal hemorrhages that would be consistent with SBS.

278. Upon information and belief, those gross findings concerning the absence of subdural hematomas and the nature of the possible retinal hemorrhages were shared with Ms. Spatenga, while at the same time she was informed that the autopsy would be unable to determine the cause of death pending further study.

279. The Medical Examiner also spoke to Defendant Dr. Jonathan Golden. Upon information and belief, the initial autopsy findings were communicated to him as well.

280. The Medical Examiner also spoke to Nassau County District Attorney Darryl Levy on December 29, 2022, and on January 5, 2023.

281. Upon information and belief, Mr. Levy was informed there were no indications of head trauma. No charges were ever filed by the Nassau County District Attorney.

282. As discussed *infra*, Dr. Golden and Ms. Spatenga routinely knowingly rejected superior medical knowledge to maintain removal proceedings against the parents and children they had predetermined committed abuse, regardless of what the evidence revealed.

283. Here, despite knowledge that no subdural hematoma existed in Empress's brain when she arrived at NUMC, and despite knowledge that no evidence of head trauma or retinal hemorrhages existed in the gross autopsy findings – which are the gold standard and superior to any imaging – Dr. Golden and Ms. Spatenga persisted in the obviously false claim that there was evidence of severe parental abuse.

### G. Severe Abuse Case Initiated in Family Court and Children Removed

284. On December 27, 2022, DSS filed severe abuse petitions against Mr. Johnson and Ms. Cabrera alleging they caused Empress's death by other than accidental mechanisms.

285. The petitions were informed by the investigation and documentation of DSS caseworkers Ms. Spatenga and Ms. Acevedo.

286. The petitions alleged that on or about December 16, 2022, Empress had the following injuries: cervical spinal cord edema, cervical ligamental edema, multiple retinal bilateral hemorrhages, compression fractures to her vertebrae at C6, C7, T1, and T2, subdural

and subarachnoid hemorrhages, diffuse cerebral edema, cerebral tonsillar herniation, and a scalp hematoma.

287. The petitions stated that Empress was placed on life support on December 17, 2022, and that she died on December 22, 2022.

288. The petitions stated that the "brain and spinal injuries were acute and consistent with a whipping back and forth motion of the child's head and neck," and that "the injuries were 'non-accidental trauma,' according to the hospital."

289. The petitions alleged that Ms. Cabrera and Mr. Johnson were the primary caretakers of the children, and that they "still have not explained the injuries."

290. The petitions alleged that Mr. Johnson "has been mostly focused on avoiding blame instead of explaining what happened."

291. In addition to raising allegations about Empress's injuries, the petitions raised allegations against Mr. Johnson and Ms. Cabrera for having a history of medically neglecting their children and delaying seeking treatment for Empress.

292. The petitions stated that Ms. Cabrera "stated that the child vomited and about an hour later the child was stiffening" and that she waited two hours before seeking emergency medical attention.

293. The petitions alleged that "in August 2022, the child Empress was in the hospital with an iron deficiency and UTI. The respondents were feeding the child hemp milk which was not sufficient for the child's nutrition, and they were supposed to bring the child to a hematologist but did not go. They did not bring this child to regular medical appointments."

294. The petitions further alleged that Mr. Johnson "was also known to CPS for a case where he failed to get the appropriate medical attention for another of his children and in

35

that case the other child had nutrition issues because of what the respondent father fed that child."

295. As set forth *infra*, Defendants improperly included these allegations after they had previously been investigated and deemed unfounded.

296. Finally, the petitions stated Ms. Cabrera "was previously indicated in a case regarding squatting with the children in 2018 in inadequate housing."

297. The petitions alleged that based on the foregoing allegations, L.B., N.M., S.S., and M.S. were derivatively abused and severely abused children.

298. The petitions repeated the same set of allegations in support of the request to continue the December 22, 2022, removal of the four children.

299. The petitions were signed and verified by Frances Defilippis, Assistant Director of Child Protective Services for DSS.

300. Ms. Defilippis swore that she is "acquainted with the facts and circumstances of the above-entitled proceeding; that she has read the foregoing petition and knows the contents thereof; that the same is true to her own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters, she believes it to be true."

301. The Court continued the removal order for the older children as well as the orders of protection.

**H. M.S. Was Subjected to a Full Skeletal Survey on January 4, 2023**

302. After filing the severe abuse petitions on December 27, 2022, DSS continued its investigation into the abuse claims.

303. On December 28, 2022, Ms. Spatenga spoke with her supervisor, Lisa Jacobson about next steps on the case.

304. Ms. Jacobson told Ms. Spatenga that the "DCA" wanted the youngest of Ms. Cabrera's children, who was three years old, to have a skeletal survey. Upon information and belief, DCA refers to the Director of Child Advocacy, Dr. Golden.

305. Ms. Jacobson told Ms. Spatenga that since M.S. was over two years old, they could not do that at the Child Advocacy Center and she would have to get a prescription from the pediatrician for a skeletal survey to be done through a radiology center.

306. On December 30, 2022, Ms. Spatenga contacted the children's pediatrician at CCMC Pediatrics, and learned that M.S. had a well child visit scheduled for January 3, 2023.

307. Ms. Spatenga requested that the pediatrician, Dr. Polsinelli, put in a referral for a skeletal survey when M.S. came in for that appointment.

308. Ms. Spatenga did not speak with Ms. Cabrera or request her permission to subject her child, M.S., to a skeletal survey.

309. The family court did not issue a court order authorizing Ms. Spatenga to subject M.S. to a skeletal survey.

310. Rather, Ms. Spatenga simply contacted the children's grandmother and told her she needed to take M.S. for a skeletal survey.

311. On January 3, 2023, Ms. Spatenga received confirmation from the children's pediatrician that she had seen M.S. for a well visit and everything was fine. Dr. Polsinelli told Ms. Spatenga that she provided the maternal grandmother with a prescription to take M.S. for a skeletal survey.

312. On January 4, 2023, M.S. was subjected to a full skeletal survey.

313. Ms. Cabrera was not present with M.S. when she was taken to have the skeletal survey done.

314. Ms. Cabrera learned that her three-year-old child was having the examination when she spoke to her mother by phone, who told Ms. Cabrera that she was told she had to take her.

315. The results of that skeletal survey were negative, meaning that there was no evidence of fractures anywhere on M.S.'s body.

**I. Ms. Spatenga's Continued Investigation Revealed No Concerns About Plaintiffs' Care of The Children**

316. On January 3, 2023, Ms. Spatenga spoke with the mother of Mr. Johnson's older children. She told Ms. Spatenga that Mr. Johnson is a great father, and she does not believe he has ever used physical discipline with the children.

317. On January 5, 2023, Ms. Spatenga spoke with L.B.'s biological father who supported his son remaining with his siblings as he did not wish to split them up after losing their baby sister Empress.

318. L.B.'s father told Ms. Spatenga he could not see Ms. Cabrera or Mr. Johnson being aggressive, using physical discipline, or harming Empress.

319. He said he does not have concerns about them; he said Mr. Johnson is not one to lose his temper and that he is a family man.

320. L.B.'s father also confirmed L.B. had never disclosed any concerns about physical discipline or other concerns in the home.

321. On January 19, 2023, L.B. and N.M. were sent to the CAC for another round of forensic interviews – this time, they were completed with the homicide detective present.

322. Both L.B. and N.M. answered the questions from ADA Bresnahan, again sharing the uneventful events of the day and night leading up to Empress's hospitalization.

### J. Medical Examiner's Autopsy Results

323. On August 2, 2023, the New York City Office of Medical Examiner issued Empress's completed autopsy report, following their comprehensive postmortem examination where homicide was suspected.

324. The medical examiner, Dr. Gina Prochilo, D.O., ruled the cause of Empress's death to be "complications of multiple infections including Influenza A and bacterial urinary tract infection." The manner of death was "natural."

325. Dr. Prochilo's determination that Empress's death was caused by the co-infection of the flu and E. Coli urinary tract infection was based on antemortem and postmortem confirmation that Empress was suffering from the flu; that she had an elevated white blood cell count and urine culture with significant E. Coli present; and that she suffered from a global hypoxic ischemia following seizure activity.

326. Dr. Prochilo also determined that Empress was a normally developed one-year-old girl, who was born full term though her delivery was complicated by her mother's Covid-19 infection and chorioamnionitis. Her weight was greater than the 95th percentile and her length was the 50th percentile.

327. Dr. Prochilo found evidence of resuscitative efforts.

328. She found the toxicology, histology, molecular genetics, and metabolic studies did not reveal any conditions that caused her death.

329. The neuropathologist, Rebecca Folkerth, MD, conducted a thorough examination of Empress's brain, dura, eyes, and spinal cord.

330. Dr. Folkerth noted that the findings detected in Empress's brain, eyes, and spinal cord were all caused by global hypoxic-ischemia.

331. Dr. Folkerth found that Empress suffered from bilateral lymphocytic conjunctivitis, a natural disease process, unrelated to trauma.

332. Dr. Folkerth concluded her diagnoses with a comment: "evidence of a primary traumatic etiology of the findings is not discerned."

333. With respect to the findings in Empress's eyes, which Dr. Folkerth concluded were caused by the hypoxic-ischemic injury, Dr. Folkerth found that Empress had "rare possible retinal petechial hemorrhages, bilateral (unconfirmed on microscopy)." Dr. Folkerth observed "there are congested retinal vessels, but no hemorrhage in either eye."

334. With respect to injuries to Empress's spinal cord, Dr. Folkerth found the injuries caused by the swelling of the spinal cord and restoration of blood flow after it had been blocked but did not find evidence of any injury caused by a fracture.

335. Based on the foregoing findings made at autopsy, the City of New York issued Empress's death certificate on August 3, 2023, indicating that her death was "natural" and caused by "Complications of Multiple Infections Including Influenza A and Bacterial Urinary Tract Infection."

### K. Continuation of Severe Abuse Proceeding

336. Despite the clear and compelling findings made by the medical examiner which confirmed that Empress's death was not caused by abuse, but rather was the result of her illnesses, DSS continued the removal of Ms. Cabrera's four children for more than two months after the autopsy report was issued.

337. Rather than take any steps to modify the orders of protection or removal order separating Ms. Cabrera from her children, Ms. Spatenga conferred with Dr. Golden about the medical examiner's findings.

338. Upon his review of the medical examiner's report, Dr. Golden attempted to undermine the conclusion that Empress's death was not the result of abuse by creating reports and analyses to suggest clinical findings, which were not confirmed at autopsy, in fact existed.

339. In his report, Dr. Golden acknowledged that he spoke with Dr. Prochilo after receiving her autopsy report, and that she believed that the retinal hemorrhages allegedly seen by the pediatric ophthalmologist were most likely the result of blood flow being restored to the body following resuscitative efforts. However, Dr. Golden claimed that he had conducted a literature search and could not find support for that conclusion.

340. Dr. Golden reviewed the medical examiner's findings with respect to Empress's spinal cord but maintained that his assessment was that her spinal cord injuries were indicative of trauma.

341. Ultimately, however, Dr. Golden conceded that in light of the discrepancies between the clinical and postmortem findings there was "less clinical certainty as to the origin of unverified medical findings (unverified by the ME)" and until there was further clarification about these discrepancies, he could not say with a reasonable degree of medical

certainty that the initial clinical findings were caused by impact or acceleration deceleration forces.

### L. The Children Were Removed from Ms. Cabrera's Care from December 22, 2022, Until September 11, 2023

342. Ms. Cabrera's four children were removed from her care on December 22, 2022, as a result of the temporary removal order and they were not returned to her care for nearly ten months.

343. Throughout the pendency of the family court proceeding, Ms. Cabrera and Mr. Johnson were subjected to temporary orders of protection prohibiting contact with the children, except for contact and visitation authorized by DSS.

344. Initially, all four of Ms. Cabrera's children were placed in the home with Ms. Cabrera's mother and Ms. Cabrera was allowed to visit with them there, under her mother's supervision, which she did as often as possible.

345. DSS prohibited Mr. Johnson from having any contact with the children at all.

346. On January 5, 2023, Nassau Family Court Judge Kent held the scheduled court conference with Ms. Cabrera, Mr. Johnson, and the attorneys assigned to the case.

347. On that date, Judge Kent modified the order of protection to allow Mr. Johnson to attend Empress's funeral on January 6, 2023, but required that DSS supervise the contact.

348. On January 31, 2023, Ms. Cabrera and Mr. Johnson returned to court for a conference before Judge Kent.

349. On that date, the father of M.S. and S.S. appeared in court and asked for the children to be placed with him.

350. Judge Kent continued the placement of the four children with their grandmother but ordered DSS to conduct clearances on the girls' father and to provide an update by February 3, 2023.

351. On February 5, 2023, Ms. Cabrera's daughters S.S. and M.S. were removed from their grandmother's home and placed with their father.

352. Once Ms. Cabrera's daughters were moved to their father's home, she was not able to see them as frequently, although she continued to visit them at her mother's home when their father would bring them there for weekend visits.

353. Ms. Cabrera's sons, L.B. and N.M., remained in the home of their grandmother throughout the pendency of the family court case.

354. On September 11, 2023, nearly six weeks after the medical examiner's report was issued, the Family Court began relaxing the orders of protection that had been issued limiting Mr. Johnson and Ms. Cabrera's contact with the children.

355. On that date, the Court permitted Ms. Cabrera's four children to return home to live with her and Mr. Johnson, subject to several restrictive conditions.

356. Mr. Johnson's order of protection was modified from a full stay-away order, prohibiting contact with the children, to a limited order of protection that prohibited Mr. Johnson from committing any crimes, using corporal punishment, or being left alone with the children.

357. Ms. Cabrera's order of protection was modified from an order that prohibited her from having unsupervised contact with her children to a limited order of protection that prohibited her from committing any crimes or using corporal punishment. Ms.

Cabrera's order of protection further required that she ensure Mr. Johnson was never left alone with the children.

**M. Dismissal of Severe Abuse Case**

358. On October 5, 2023, DSS moved to withdraw the petitions against Ms. Cabrera and Mr. Johnson and discontinue the proceeding.

359. Judge Robin Kent granted their request, the matter was dismissed and all orders were discontinued on that date.

360. On April 7, 2025, the allegations of abuse and maltreatment made to the State Central Register on December 16, 2022 and December 22, 2022, which had been initially marked as indicated, were all amended to "unfounded" and sealed.

**N. Damages**

361. After Ms. Cabrera suffered the unimaginable loss of her infant child to the flu, Defendants compounded her trauma by wrongly and unnecessarily separating her from her four living children for nearly ten months.

362. The loss of her four children for such an extended period of time was a significant violation of Ms. Cabrera's constitutionally protected liberty interest in the care, custody and control of her children.

363. Rather than being able to hold each other, grieve together, and process Empress's death as a family, the children were torn from their mother and placed in their grandmother's home.

364. Though she was in deep despair, Ms. Cabrera had to show up to court appearances, DSS conferences, and home visits to fight for her children to be returned to her.

365.   The experience of being misjudged and wrongfully accused of an unthinkable act was mortifying and degrading.

366.   The loss of her children caused Ms. Cabrera to suffer extreme mental distress.

367.   Ms. Cabrera felt undermined and violated when she learned her youngest surviving child, M.S. was being subjected to a full body skeletal survey without her consent; she felt that her authority and role as her parent had been stripped away from her.

368.   Ms. Cabrera began seeing a therapist to address her depression and anxiety and the therapist diagnosed her with depression and generalized anxiety disorder.  The therapist prescribed Ms. Cabrera with medication to address her diagnoses.

369.   Although Ms. Cabrera manages the best she can with talk therapy and staying busy caring for her children, waves of debilitating sadness continue, and she continues to struggle with anxiety.

370.   In addition, Ms. Cabrera suffered financial losses as she had been enrolled in college classes at the time Empress passed away.

371.   Because of the investigation and prosecution that followed Empress's death, Ms. Cabrera dropped out of school and has student loans that she is still working to repay.

372.   Mr. Johnson, like Ms. Cabrera, suffered significantly from the false allegation of severely abusing his daughter Empress.

373.   Defendants subjected Mr. Johnson to orders of protection throughout the duration of the family court case that prohibited him from having any contact with his four stepchildren whom he had helped to raise and whom he loved as his own.

374. Mr. Johnson suffered the indignity and humiliation of being falsely accused of a crime that is antithetical to his gentle spirit and his prioritization of his children's health and wellbeing.

375. Mr. Johnson also began seeing a therapist to address his anxiety and depression and was prescribed medication to help manage his diagnoses.

376. For nearly ten months, the children – L.B., N.M., S.S., and M.S. – suffered the loss of their mother and stepfather, both of whom they loved.

377. Although she spent as much time with her children as she was able during the day under her mother's supervision, Ms. Cabrera was unable to comfort her children when they awoke in the middle of the night.

378. She was unable to hold them and rock them back to sleep.

379. M.S. was only three years old at the time she was removed from her mother, unable to understand or appreciate the events breaking her family apart or causing her baby sister's death.

380. M.S. was subjected to medically unnecessary radiation in the form of a full skeletal survey, despite being a well child.

381. Ms. Cabrera could not be there to provide the physical reassurance and nourishment of a mother's love during that time.

382. S.S. was five years old when Empress died and reacted strongly to the death of her little sister and separation from her mother. She was very emotional but could not express herself or talk about her sister's passing while she was living with her father.

383. At school, S.S. would speak out inappropriately, often bringing up her sister's death in class. S.S. struggled to focus academically and eventually received an

individualized education plan (IEP) and placed in a smaller class setting to accommodate her learning needs.

384. When she returned home, S.S. had a lot of questions. She was anxious and clung to her mother.

385. S.S. began seeing a therapist at school twice a week. She also attended a grief group and began seeing a therapist outside of school.

386. N.M. turned twelve years old the month after Empress passed away. He was the first one in the family to catch the flu and became consumed with guilt for giving it to his brother to L.B. and then to Empress.

387. N.M. believed he was responsible for the family's tragic separation.

388. In his first year of middle school, N.M. had been doing well in school in academics and athletics.

389. After his sister passed away and he was taken from his mother's care, N.M. lost interest in school and his grades dropped significantly. He quit playing sports and stopped engaging in after school activities.

390. N.M. withdrew from everyone and developed severe social anxiety. Rather than display his emotions, he would isolate and avoid interacting with others.

391. N.M. became paranoid around his younger siblings. He blamed himself for giving his brother L.B. and Empress the flu.

392. L.B., the eldest child, has tried to assume a new level of responsibility in the family, believing he failed in some way to protect them from Empress's passing.

393. He would wake early in the morning to check on his siblings and mother to make sure everyone is alive and breathing.

394. Whenever anyone became sick after Empress's passing, L.B. became severely anxious.

395. While L.B. excelled in school before his sister's passing, he struggled to focus and his grades suffered after.

396. Though Ms. Cabrera has been reunified with her children since September 11, 2023, the trauma of being separated has continued to cause each of them ongoing distress.

**DEFENDANTS ARE STATE ACTORS ACTING UNDER COLOR OF STATE LAW**

397. The named Defendants are state actors acting under color of state law and therefore subject to suit under Section 1983, 42 U.S.C. § 1983.

398. The Department of Social Services ("DSS") is an agency empowered by the Nassau County to investigate complaints of child abuse and neglect, file petitions alleging neglect and abuse, conduct emergency removals of children from their homes, and to seek such removals by court order.

399. Defendant Spatenga was employed by DSS as a caseworker investigating child abuse and neglect cases and was the primary caseworker assigned to investigate the allegations surrounding Empress's hospitalization and tragic passing.

400. Defendant Defilippis was employed by DSS as an Assistant Director of Child Protective Services.

401. Caseworkers who investigate allegations of abuse or neglect and make decisions to seek the removal of children are state actors pursuant to § 1983. *See e.g.*, *Cornejo v. Bell*, 592 F.3d 121(2d Cir. 2010) (finding ACS caseworkers who investigated the case and caused the abuse petitions to be commenced against the Plaintiffs "essentially functioned much

48

more like investigators than prosecutors" and that they "perform[ed] what was 'fundamentally a police function.'")

402. As such, Defendants Spatenga and Defilippis are state actors and suable under § 1983.

403. Defendants Golden, CCMC, and Northwell Health are also state actors who are suable under § 1983.

404. "A private person — not a government official — acts under color of state law for purposes of § 1983 when 'he has acted together with or has obtained significant aid from state officials' or because his conduct is otherwise chargeable to the state." *Barrett v. Harwood*, 189 F.3d 297, 304 (2d Cir. 1999) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

405. The Second Circuit has long recognized that hospitals may be sued as state actors when they act "as part of the reporting and enforcement machinery for [Child Welfare Agency], a government agency charged with detection and prevention of child abuse and neglect." *Kia P. v. McIntyre*, 235 F.3d 749 (2d Cir. 2000). *See also Perez v. Sugarman*, 499 F.2d 761, 764-65 (2d Cir. 1974) (quoting *Evans v. Newton*, 382 U.S. 296, 299 ("In certain instances the actions of private entities may be considered to be infused with 'state action' if those private parties are performing a function public or governmental in nature and which would have to be performed by the Government but for the activities of the private parties.").

406. As such, although medical personnel at a private, non-governmental institution, do not ordinarily constitute state actors under § 1983, "when there is 'joint interference of state agents and private parties with private rights,' it constitutes state action attributable to both public and private parties." *Armstrong v. Brookdale Univ. Hosp. & Med.*

49

*Ctr.*, 2002 U.S. Dist. LEXIS 29224, *10, (E.D.N.Y. Jan. 3, 2002) (quoting *In Kia P. v. McIntyre*, 235 F.3d 749, 757 (2d Cir. 2000)). *See also Johnson v. City of New York*, 2021 U.S. Dist. LEXIS 159482, *19, (S.D.N.Y. August 23, 2021) (quoting *Sybalski v. Indep. Grp. Home Living Program Inc.*, 546 F3d 255, 257 (2d Cir. 2008) ("[a nominally private entity's] actions can be attributed to the state under the 'close nexus' test if the state 'provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,] or the entity's functions are 'entwined' with state policies.'").

407. Medical personnel engage in state action when they cross the line from treating a patient and reporting concerns of abuse or neglect to taking on investigatory purposes at the behest of the state, detaining a child to conduct such investigation beyond what is medically necessary, or pursuing charges against a parent. *See e.g.*, *Estiverne v. Esernio-Jenssen*, 581 F. Supp.2d 335, 345 (E.D.N.Y. 2008) ("Medical Defendants began 'acting in [their] role as an instrumentality of the government' by holding [the child] 'as part of the State's effort to detect and prevent child abuse,' and, as such, became subject to § 1983 as state actors.")

408. Dr. Golden did not provide any medical treatment or care to Empress, rather he acted in his capacity as Director of CCMC's Child Advocacy and Clinical Forensic Medicine to perform essentially a law-enforcement function, investigating a potential crime of child abuse in cooperation with Nassau County.

409. Indeed, Dr. Golden continued his investigation into what he claimed was child abuse for a substantial amount of time after Empress could no longer receive treatment because she had passed away.

410. He was in frequent communication with the medical examiner's office (OCME), and, months after Empress's death, Dr. Golden continued to work with DSS to dispute the findings of the OCME.

411. As such, Dr. Golden acted in an investigative capacity in furtherance of DSS's abuse investigation, and should therefore be deemed a state actor acting under color of state law.

## *MONELL* ALLEGATIONS AGAINST DEFENDANTS CCMC, NORTHWELL HEALTH, AND NASSAU COUNTY

412. Institutional Defendants CCMC, Northwell Health, and Nassau County are liable for the constitutional violations of their employees as those employees were acting pursuant to an unconstitutional custom of over-diagnosing possible abusive mechanisms and disregarding alternative non-abusive explanations for injuries, which has resulted in the wrongful separation of families.

413. Despite many instances of their employees' abuse claims being contradicted by superior evidence or being rejected by judges, the institutional Defendants have failed to train their employees on the medical mimics for injuries and advances in science that have called SBS/AHT diagnoses into question.

414. This pattern and practice exposes Defendants' deliberate indifference to the constitutional rights of the families suspected of child abuse.

415. Second, CCMC and Northwell Health are liable for the constitutional violations of Dr. Golden, as he was designated the "Director of Child Advocacy and Clinical Forensic Medicine," not merely a staff physician, and as such was a policymaker with final decision-making authority.

51

*a. Defendants' Unconstitutional Custom of Over-Diagnosing Abuse and Disregarding Non-Abusive Explanations for Injuries Constitutes Deliberate Indifference to Plaintiffs' Constitutional Rights*

416. Defendants' violations of the constitutional rights of Plaintiffs and Infant Plaintiffs were not mere accidents or anomalies, but, instead, were part of a larger pattern of County DSS caseworkers and CCMC child abuse pediatricians advancing scientifically unreliable allegations of abuse and eschewing non-abusive explanations for injuries, causing unnecessary and wrongful separation of families.

417. Indeed, designated child abuse experts employed by CCMC and relied upon by Nassau County have a long history of overstating the certainty of abuse diagnoses in medically complex cases and a long history of ignoring alternative medical explanations in cases (complex or not) where children have findings that *can* be associated with abuse, which together have repeatedly resulted in their findings being questioned or overturned.

418. For two decades, CCMC (called Schneider Children's Hospital until 2010), has employed child abuse pediatricians ("CAPs") who have made unreliable and ultimately unsupportable claims of abuse.

419. From 1998 to 2010, Schneider Children's Hospital employed Dr. Esernio-Jenssen, as the director of its child protection team.

420. Dr. Esernio-Jenssen also served as the Chair of the Child Protection Consultation Team for North Shore – Long Island Jewish Health System (now Northwell Health).

421. During her tenure with Schneider Children's Hospital and North Shore – Long Island Jewish Health System, Dr. Esernio-Jenssen proved to be an unreliable source who repeatedly over-diagnosed child abuse.

422. In a 2004 Queens case, Dr. Esernio-Jenssen accused a mother, V.S., who she knew was bedridden, of violently shaking her infant, leading to her prosecution in family court and the removal of her infant child T.S.

423. Dr. Esernio-Jenssen later informed authorities that she no longer believed the mother had harmed the child, but still testified in the prosecution against the mother that she believed T.S. suffered from SBS, and while no abuse finding resulted, the mother sued – alleging that Esernio-Jenssen's history of over-diagnosing child abuse contributed to the wrongful removal. *V.S. v. Muhammad*, 07-cv-213 (E.D.N.Y. 2007).

424. Though child welfare officials were ultimately deemed immune from suit for relying on the doctor's expertise, they were undoubtedly put on notice of Dr. Esernio-Jenssen's unreliability when they were forced to withdraw the case based on her claims. *V.S. v. Muhammad*, 595 F.3d 426 (2d. Cir 2010).

425. In another case, in November 2004, Mario Estiverne and Nativida Antoine brought their 9-month-old son to Schneider Children's Hospital with a minor wrist fracture, a non-complex issue, which Dr. Esernio-Jenssen hastily declared the result of abuse (shaking) – leading hospital staff to detain the infant and his siblings and report the parents for child abuse.

426. An orthopedic specialist found no signs of abuse and the case was dismissed in 2005 with the children returned home, and the family court judge finding Dr. Esernio-Jenssen incredible.

427. The parents later filed a lawsuit accusing Dr. Esernio-Jenssen of making a false report and ignoring evidence of an accidental injury; a federal judge allowed their claims to proceed, citing allegations that the doctor was a "zealot" known for misdiagnosing abuse. *Estiverne v. Esernio-Jenssen*, 581 F. Supp. 2d 335, 349 (E.D.N.Y. 2008).

428. In December 2005, Dr. Esernio-Jenssen was again found incredible in *Matter of V.L.*, by another Queens Family Court judge for making false allegations of Shaken Baby Syndrome against another innocent family.

429. In January 2006, parents Denes Q. and Ann-Marie C. took their 22-month-old daughter (initials Y.Q.) to another North Shore – Long Island Jewish Health System hospital concerning a burn on her chest; Dr. Esernio-Jenssen examined the toddler, ordered a full battery of abuse screenings, and initially even suggested the burn could have come from an accidental hot-liquid spill. All tests (skeletal survey, retinal exam) came back normal with no evidence of abuse, and the case against the parents was dropped within months – but the family later sued Dr. Esernio-Jenssen and the hospitals for illegally detaining and testing their child without proper cause. *Denes Q. v. Caesar*, 07-cv-1281 (E.D.N.Y. 2009).

430. In 2010, Dr. Ersenio-Jenssen left Schneider and the other Northwell Health hospitals and relocated to Florida, and later Pennsylvania, where she has continued to make erroneous claims of abuse that have led to numerous lawsuits against her and the hospitals with which she has been affiliated.

431. Northwell Health and Schneider (later CCMC) continued working with child abuse pediatricians who continued Dr. Esernio-Jenssen's practice of advancing unreliable shaken baby syndrome claims against innocent parents.

432. In *Estate of Keenan v. Hoffman-Rosenfeld et al.*, 2:16-cv-00149 (E.D.N.Y. 2016), parents of deceased child brought a case against Dr. Jamie Hoffman-Rosenfeld of CCMC for bringing false shaken baby charges against them, causing the removal of the deceased child's two brothers and a lengthy family court proceeding that the Court ultimately dismissed in the parents' favor.

433. As in this case, the autopsy in *Estate of Keenan* later confirmed that many of the alleged injuries that Dr. Hoffman-Rosenfeld claimed supported the SBS diagnosis did not exist.

434. The parents later sued, alleging that Dr. Hoffman-Rosenfeld's rushed diagnosis triggered a baseless removal; the lawsuit was dismissed on immunity grounds.

435. In another case filed in Bronx Family Court in 2020, Dr. Hoffman-Rosenfeld, then working for Montefiore Hospital, claimed the parents had shaken their infant Caleb S., after he presented to the hospital with seizures and other complicated medical conditions, but was subsequently found to have a subdural hematoma. *Matter of Caleb S. (Gina R.)*, 2020 N.Y. Misc. LEXIS 23325 (Bronx Fam. Ct. 2022).

436. After a protracted "emergency hearing" to determine whether the allegations of abuse justified the continued separation of Caleb and his sister from their family, at which multiple expert witnesses testified, the family court judge found Dr. Hoffman-Rosenfeld's testimony and claims of AHT lacking and insufficient to justify the continued separation of the children from their family, "Aside from being unable to adequately explain how Caleb's medical findings were a result of abuse, Dr. Hoffman-Rosenfeld was not able to explain how Caleb's medical findings could not have resulted from a combination of dehydration and inflammation." *Matter of Caleb S.*, at *32.

437. In 2019, Dr. Golden was hired by Northwell Health as the Director of child Advocacy and Forensic Medicine at CCMC, and Director of the Child Advocacy Center in Queens, New York. Like his predecessors, Dr. Golden has a track record of disregarding, ignoring, or downplaying likely medical or accidental explanations for injuries, and instead

maintaining in child abuse investigations that injuries must have resulted from non-accidental trauma.

438.    In a case filed in Queens Family Court in December 2023[3], where a child suffered multiple fractures, Dr. Golden testified that even though he was aware the child suffered from osteogenesis imperfecta, a condition known to cause susceptibility to fractures, he could not say that the child's injuries were not caused by non-accidental trauma because the parents failed to provide a reasonable explanation as to how the injuries occurred.  Indeed, the parents did provide an explanation for the child's injuries – he had fallen at daycare – but Dr. Golden did not believe that explanation was reasonable as the child had fallen while crawling.

439.    In January 2023, in a case filed in Queens Family Court, the petition alleged that Dr. Golden did not believe the parents adequately explained the "burn marks" which he alleged were the result of non-accidental trauma; in fact, the child had not been burned but had a skin reaction to garlic being used on him – a cultural practice in his family.  Dr. Golden later admitted the child's injuries were consistent with that cultural practice, and the infant was returned to his parents.

440.    In yet another case, Dr. Golden claimed that bruises to a two-year-old child's face, neck, legs and back could not have been self-inflicted or caused by another two-year-old child, despite being provided with a history that the child had been hit repeatedly with a hanger by another child while in the care of a babysitter.  Though the child was subjected to a full skeletal survey at CCMC, which confirmed he had no fractures, Dr. Golden testified that the child suffered non-accidental trauma, which must have been caused by an adult, leading to the

---

[3] This case and the following three examples (¶¶ 439-441) are drawn from recent family court proceedings in which Dr. Golden opined the child's injuries were inflicted through non-accidental trauma; these cases do not have published opinions.

removal of the child and his sibling from their parents.  In that case, the babysitter was also named as a respondent, and had her children removed from her care as well.

441.    In another case filed, Dr. Golden testified that he believed a two-year-old child's leg fractures were the result of non-accidental trauma, despite his recognition that all of the child's injuries could have been sustained by the child falling from a standing height and the child's mother had witnessed the child fall and injure himself.  In that case, Dr. Golden claimed that it was the number of injuries that he found concerning for non-accidental trauma, despite there being no other indications throughout the investigation that the child had been harmed by anyone.

442.    Finally, in November 2022, Dr. Golden diagnosed a five-week-old infant with SBS because she was found to have subdural hematomas and retinal hemorrhages.  Though the infant, Mackenzie K., was brought to the hospital exhibiting seizure-like activity and tested positive for Covid-19, Dr. Golden claimed there were no underlying medical conditions which correlated to her medical conditions.  Mackenzie K., survived and had no lasting physical injuries, but she and her older brother Landon K. were nonetheless separated from their parents for nearly a year, and the family court entered an abuse finding based on Dr. Golden's claim that Mackenzie K. had been violently shaken.

443.    That finding was later overturned by the Appellate Division, where the Second Department found that SBS/AHT diagnosis was not supported by the medical findings, and that contrary to Dr. Golden's testimony, "the injuries sustained by Mackenzie K. were not intentionally inflicted, as there were no external injuries, her 'bridging veins' were not torn or bleeding, which would have occurred if she had been shaken, and the patterns and amount of bleeding in the brain, along with the location of the subdural hemorrhages, were inconsistent

57

with 'shaken baby syndrome.'" *Matter of Landon K. and Mackenzie K.*, __A.D.3d__, (2d Dept. May 28, 2025).

444.    Despite repeated notice to CCMC and Northwell Health of the failures of its Child Abuse Protection directors to reliably render opinions concerning abuse diagnoses and indeed the propensity of such CAP directors to over-diagnose abuse, CCMC and Northwell Health failed to take corrective action by training its CAPs, disciplining its child abuse doctors and directors whose unreliable opinions harmed families, or requiring that specialists, who have appropriate training and expertise in the fields of neurology, neurosurgery, and neuroradiology, provide independent assessments of children with intracranial injuries and that those assessments are provided to DSS and the district attorney.

445.    Instead, CCMC and Northwell Health have continued to endow its Child Protection Directors with tremendous autonomy and policymaking authority.

446.    In fact, all actions undertaken at CCMC relating to child abuse follow the CCMC Child Abuse Guidelines, which serve to suppress medical views contrary to the views of the CAPs in cases of potential abuse.

447.    The County has also continued to routinely defer to CCMC/Northwell Health Child Protection directors in cases where there are findings that can be associated with abuse to conduct investigations into the causes and mechanisms of children's injuries and has failed to take any actions to remedy the systemic failures.

448.    This "pattern of similar constitutional violations by untrained employees" rises to the level of "deliberate indifference for the purposes of failure to train" employees of both DSS and CCMC. *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

449. As such, Defendants Nassau County, CCMC, and Northwell Health are liable for the unconstitutional actions taken by their employees that were made pursuant to their unconstitutional custom and practice of deferring to scientifically unsound and unreliable "experts" in child abuse investigations.

*b. Defendants' Failure to Train on Evolving SBS/AHT Science*

450. Defendants' failed to take appropriate steps to train their employees regarding the changes in forensic science that have led to exonerations of individuals wrongfully convicted of SBS in recent history.

451. The theory of SBS, developed in the 1970s and 1980s, was that the existence of certain internal findings (subdural hematoma, retinal hemorrhages, and brain swelling) without any external signs of impact, was diagnostic of an infant being shaken.

452. The theory was premised on the idea that if a young child or infant is violently shaken, his or her brain will move within the skull, rupturing the bridging veins that cover the layers of the brain between the brain and the dura, which will cause widespread bleeding in the subdural brain space.

453. This theory was used to explain the constellation of internal findings where babies did not have any external signs of trauma.

454. Based on the existence of these findings, and the testimony of doctors claiming that they were necessarily the result of violent shaking, many people have been charged in family and criminal court proceedings – from child abuse to murder.

455. For the past twenty years, there has been growing recognition that these findings in young children and babies are non-specific and can be related to many accidental and natural disease process causes and are not necessarily caused by abuse.

456. Indeed, the constellation of medical findings often used in support of a SBS or AHT diagnosis has been found both clinically and at autopsy in patients suffering accidental and medical conditions unrelated to abuse including short falls, infections, and metabolic disorders. *See e.g.*, Mark J. Shuman, M.D., M.S. and Kenneth D. Hutchins, M.D., *Severe Retinal Hemorrhages with Retinoschisis in Infants are Not Pathognomonic for Abusive Head Trauma*, J. Forensic Sci. Vol. 62, No. 3 (May 2017).

457. In 2007, the Supreme Court addressed the issue of evolved understanding of SBS science in *Cavazos v. Smith*, 565 U.S. 1 (2011) (Ginsburg, R., dissenting). Though the Court's *per curium* majority reversed the grant of habeas corpus based on the deferential standard of review required under the Antiterrorism and Effective Death Penalty Act (AEDPA), Justice Ginsburg's dissent conducted a review of the evolving medical literature on SBS and found, "What is now known about shaken baby syndrome (SBS) casts grave doubt on the charge leveled against Smith."

458. In 2009, the American Academy of Pediatrics ("AAP") Committee on Child Abuse and Neglect issued a policy statement recommending modifying the terminology of the SBS moniker to Abusive Head Trauma ("AHT") to broaden the definition to include other abusive mechanisms, such as blunt impact. In that policy statement, the AAP noted that medical diseases can mimic the presentation of AHT and that such mimics should be screened for during evaluation. *See* Cindy Christian, M.D., and Robert Block, M.D. *Abusive Head Trauma in Infants and Children*, J. Pediatrics (2009).

459. In 2019, in a white paper consensus statement endorsed by the AAP that was designed primarily to rebut mounting challenges to SBS/AHT diagnoses, the authors defended the reliability of the diagnosis in cases with multiple findings that are inconsistent with "the provided mechanism of trauma" but advised that the "work-up must exclude those medical

60

diseases that can mimic AHT." A.K. Choudhary, S. Servaes, T.L. Slovis, et al., *Consensus Statement on Abusive Head Trauma in Infants and Young Children*, 48 Pediatr. Radiol. 1048 (2018).

460. More recently, in 2024, the Supreme Court again flagged growing concern about the unreliability of SBS science, noting that it had been responsible for many wrongful convictions. *See McCrory v. Alabama*, 144 S. Ct. 2483 (2024) (Sotomayor, J., dissenting FN 2) ("there is now significant doubt in the medical community over the validity of "Shaken Baby Syndrome," or SBS, an expert diagnosis that formed the basis for convicting caregivers of murder when babies died suddenly under their care").

461. Appellate courts throughout the country have also considered whether SBS/AHT constitutes reliable science upon which convictions may be upheld and found that changes in scientific understanding as to such claims warrant reversal. *See e.g.*, *State v. Edmunds*, 746 N.W.2d 590 (Wis. Ct. App. 2008) (affirming a lower court's order granting a new trial to Edmunds, a daycare provider convicted of reckless homicide, finding there had been a shift in medical opinion regarding the reliability of the "triad" which constituted "newly discovered evidence" undermining the reliability of her conviction); *Commonwealth v. Epps*, 53 N.E.3d 1247, 763-767 (Mass. 2016) (vacating a defendant's murder conviction acknowledging significant developments in the understanding of SBS/AHT); *Del Prete v. Thompson,* 10 F.Supp.3d 907 (N.D. Ill. 2014) (granting a writ of habeas corpus after conducting a meticulous review of the scientific literature and expert testimony, and concluded no reasonable jury would have convicted the defendant based on the modern understanding of SBS); *State v. Nieves,* 477 N.J. Super. 453 (App. Div. 2023) (affirming the trial court's finding that expert testimony on

61

SBS/AHT did not meet the standard for scientific reliability in New Jersey) (the case is currently on appeal to the New Jersey Supreme Court, decision pending).

462. New York Courts confronted with these issues have similarly found evolving SBS/AHT science warranted reversing convictions. *People v. Bailey*, 144 A.D.3d 1562 ( 4th Dept 2016) ("we conclude that defendant established, by a preponderance of the evidence … that 'a significant and legitimate debate in the medical community has developed in the past ten years over whether infants [and toddlers] can be fatally injured through shaking alone, . . . and whether other causes [such as short-distance falls] may mimic the symptoms traditionally viewed as indicating shaken baby or shaken impact syndrome') (quoting *Edmunds*, 745 N.W.2d at 596).

463. The National Registry of Exonerations currently lists 41 cases of individuals who had been convicted of crimes based on allegations of SBS and have since been exonerated.[4]

464. Despite this overwhelming recognition that SBS science is unreliable and has repeatedly led to devastating consequences for families falsely accused of it, Defendant Nassau County and CCMC, working in collaboration, continued to bring these claims in 2022 without meaningfully questioning or acknowledging the limitations of such diagnoses, including the instant case against Ms. Cabrera and Mr. Johnson.

465. Nassau County and CCMC knew that their doctors and caseworkers are faced with cases involving infant deaths where SBS would be suspected, yet they failed to take action to ensure their doctors or caseworkers are trained on the medical mimics and accidental

---

[4] The National Registry of Exonerations identifies 41 individuals who have been exonerated for crimes related to SBS, available at https://exonerationregistry.org/cases?f%5B0%5D=n_pre_1989%3A0&f%5B1%5D=tags%3ASBS (last accessed October 14, 2025).

mechanisms that can account for intracranial injuries, and as a result have allowed numerous innocent parents to face traumatic separations and wrongful family court prosecutions.

466.  Moreover, CCMC and Nassau County DSS reasonably knew or should have known that more cases of alleged SBS/AHT would come before them and that the science on these types of allegations had been challenged, found unreliable in numerous forums around the country, and had led to wrongful convictions being reversed.

467.  Indeed, they were aware of several instances, discussed *supra*, where their own CAPs claimed children had been shaken, but those claims were later rejected or withdrawn because they were not reliable.

468.  As such, CCMC, Northwell Health and Nassau County are responsible for the constitutional violations alleged in this case.

   c.  *As the Director of Child Advocacy and Clinical Forensic Medicine Defendant Golden Was a Hospital Policymaker*

469.  Decisions or actions by policymakers can subject the entity to Section 1983 liability.

470.  Dr. Golden, as the "Director of Child Advocacy and Clinical Forensic Medicine," was not merely a staff physician.

471.  Dr. Golden's title and role indicate that he had final authority to establish the medical-forensic policy and conclusions for CCMC in this case.

472.  His determination that Empress's death was the result of abuse became the hospital's official position, which was then transmitted to and relied upon by the County.

473.  His actions were the hospital's policy in this matter. *See Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 370 (E.D.N.Y. 2011) (noting that a § 1983 plaintiff can establish municipal liability by showing that a policymaker took the action himself).

474. As such, CCMC and Northwell Health are liable under § 1983 for Dr. Golden's actions in the capacity of a hospital policymaker.

**FIRST CAUSE OF ACTION**
Violation of Plaintiffs' Right to be Free from Malicious Prosecution
Under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983
*Against All Defendants on Behalf of Plaintiffs Cabrera and Johnson*

475. Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

476. Defendants, acting under color of state law, maliciously prosecuted Plaintiffs Cabrera and Johnson in Nassau County Family Court by initiating an Article 10 severe abuse proceeding against them which terminated in Plaintiffs' favor, lacked probable cause, was motivated by actual malice, caused Plaintiff Cabrera to lose custody of her children for ten months, and caused Plaintiff Cabrera and Plaintiff Johnson to suffer substantial restrictions on their liberty.

477. Plaintiffs may bring § 1983 malicious prosecution claims against defendants, who are state actors, for violating their rights under the Fourth Amendment when those defendants (1) initiate a criminal proceeding against them; (2) which terminates in plaintiffs' favor; (3) there was a lack of probable cause to initiate the proceeding; and (4) actual malice was a motivation for defendants' actions. *See Davis-Guider v. City of Troy*, No. 23-589, 2024 U.S. App. LEXIS 32451 (2d Cir. Dec. 23, 2024) (discussing the New York state elements of malicious prosecution, which are required to bring a federal § 1983 claim).

478. Though most frequently applied to criminal prosecutions, malicious prosecution claims can be applied to prosecutions in civil actions when there is a deprivation of liberty as a result of the prosecution. *See e.g.*, *Stampf v. Long Island R.R.*, 761 F.3d 192, 198 (2d Cir. 2014); and *McCaul v. Ardsley Union Free Sch. Dist.*, No. 11 Civ. 5586 (VB), 2012 U.S.

Dist. LEXIS 80888, *36-37 (S.D.N.Y. May 3, 2012), aff'd, 514 F. Appx 1, 4 (2d Cir. 2013) (summary order).

479. To bring a federal malicious prosecution claim based on a civil prosecution, "the underlying civil proceeding ha[s] to 'implicate the Fourth Amendment to such a degree as to permit a § 1983 claim.'" *Mcree v. City of New York*, 2025 U.S. Dist. LEXIS 54046, *13 (E.D.N.Y. Mar. 25, 2025) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 317 (2d. Cir. 2004)).

480. "[R]emoval of a child from her parents, via civil family court proceedings, implicates sufficient constitutional interests to support a malicious prosecution claim." *Kurtz v. Hansell*, 2021 U.S. Dist. LEXIS 56037, at *37 (S.D.N.Y. Mar. 24, 2021) (citing *Cornejo v. Bell*, No. 04 Civ. 341 (BMC), 2008 U.S. Dist. LEXIS 89597, *37 (E.D.N.Y. May 16, 2008)).

481. Indeed, several District Judges in the Second Circuit have found malicious prosecution to be a valid cause of action when brought against caseworkers or child abuse pediatricians who made false reports of abuse, and pursued family court cases against parents without probable cause, which resulted in lost liberty for the parents, namely the loss of temporary custody of their children. *See e.g. Kurtz v. Hansell* ("*Kurtz I*"), 2021 U.S. Dist. LEXIS 56037, *38 (S.D.N.Y. Mar. 24, 2021) (the District Court found that the removal of Plaintiffs' infant twins from their parents' for more than a month (and the highly restricted access to the children for eight more months) was "substantial enough to support a claim for malicious prosecution)"; *V.A. ex. Rel. O.A. v. City of New York*, 23 U.S. Dist. LEXIS 171592 (S.D.N.Y. Sept. 26, 2023) (the District Court found the separation of a child from her parents for approximately eight months was sufficient to implicate the parent and child's Fourth Amendment rights to make out a malicious prosecution claim; though the court granted the

motion to dismiss as plaintiffs failed to plead the family court petition was based on knowingly false statements).

    *a.   Defendants Initiated a Civil Prosecution Against Plaintiffs*

482.    The first element of a malicious prosecution claim is that the prosecution be initiated by the defendants against the plaintiffs.

483.    On December 27, 2022, Nassau County Department of Social Services filed Article 10 petitions in Nassau County Family Court charging Plaintiffs Cabrera and Johnson with severe abuse, abuse, and neglect, of Empress, M.S., S.S., N.M., and L.B.

484.    These civil prosecutions carried the risk of grave consequences: the loss of custody of Infant Plaintiffs, collateral employment consequences, and the reputational damage of being branded an *abuser*.

485.    The petitions filed against Ms. Cabrera and Mr. Johnson were initiated by all of the Defendants.

486.    That Defendant Spatenga is responsible for initiating the prosecution is evident from the severe abuse petitions themselves, which credit the allegations to her investigation and reporting.

487.    Defendant Defilippis is also responsible for initiating the prosecution as she signed and verified the allegations contained in the severe abuse petitions.

488.    Defendant County can also be said to have initiated the prosecution, as the County had a policy or standard practice of commencing and continuing child abuse proceedings based on information that it knew, or should have known, to be false or unreliable.

489. Defendants Spatenga and Defilippis, acting pursuant to that policy, commenced and continued child abuse proceedings against Plaintiffs Cabrera and Johnson based upon false, unreliable information.

490. Individuals who collaborate with caseworkers in the investigation of child abuse claims may be found to "initiate" a prosecution for malicious prosecution purposes when he or she "'play[s] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (quoting *DeFilippo v. Cnty. of Nassau*, 183 A.D.2d 695, 696 (N.Y. App. Div. 1992)).

491. As such, an individual who gives false information to authorities may be liable for malicious prosecution if "at the time the information was provided, the defendant knew [such information] to be false." *Lupski v. Cnty. of Nassau*, 32 A.D.3d 997, 998 (N.Y. App. Div. 2006).

492. Doctors who provide such knowingly false information to child welfare caseworkers, which are used to support family court prosecutions may be found to have initiated those prosecutions. *See e.g.*, *Estiverne v. Esernio-Jenssen*, 581 F. Supp. 2d 335, 349 (E.D.N.Y. 2008) (denying a motion to dismiss a malicious prosecution claim against the defendant, a child abuse pediatrician, who allegedly "knew her report to the Central Register was false at the time she made it, which if true would be sufficient to support a malicious prosecution claim"); *Emanuel v. Griffin*, 2013 U.S. Dist. LEXIS142723, *24 (S.D.N.Y. Oct. 2, 2013) (denying a motion to dismiss state law malicious prosecution claims against a psychologist who conducted flawed forensic evaluations of children that formed the basis of sexual abuse petitions, which were ultimately dismissed in plaintiffs' favor).

493. Defendant Golden, a state actor as discussed *supra*, initiated the severe abuse prosecutions against Ms. Cabrera and Mr. Johnson by providing knowingly false and misleading information to Defendant Spatenga, which DSS then relied on to support the severe abuse petitions filed on December 27, 2022.

494. On December 29, 2022, when the case came before the Honorable Ellen R. Greenberg, she promptly granted Defendants' requests to continue the pre-petition removal of Infant Plaintiffs from their mother's and stepfather's care, finding that based on the allegations in the petition, the children would be at imminent risk of serious harm, and no court orders could mitigate such risk of harm.

495. In addition to initiating the prosecution of the severe abuse cases based on false and knowingly incomplete information, Defendants Spatenga and Golden caused the charges to be continued against Plaintiffs for two months after the medical examiner issued her comprehensive autopsy that concluded Empress's death was caused naturally and was not the result of abuse.

496. Defendant Golden continued to challenge and undermine the superior postmortem analysis, despite overwhelming evidence that the alleged injuries Defendants had relied upon to support non-accidental trauma diagnosis did not, in fact, exist.

497. Indeed, the most alarming clinical findings of bilateral retinal hemorrhages and spinal cord fractures were conclusively ruled out at autopsy.

498. Nonetheless, Defendant Golden, in collaboration with Defendant Spatenga, spent nearly two months suggesting that those findings should be maintained.

499. As a result, from August 3, 2023 to October 5, 2023, Defendants wrongfully pursued the baseless prosecution against Plaintiffs.

500. Defendant County failed to adopt any policies for withdrawing child abuse proceedings when probable cause dissipates.

501. Defendant County knew or should have known that the failure to adopt such policies would cause their employees to abuse government power by filing and continuing child abuse proceedings maliciously and without probable cause.

502. As such, Defendants Spatenga, Defilippis, and Golden initiated and maintained false charges of severe abuse in gross and wanton disregard of Plaintiffs' rights to be free of malicious prosecution under the Fourth and Fourteenth Amendments to the United States Constitution.

### b. Termination in Plaintiffs' Favor

503. The second element of a malicious prosecution claim is that the prosecution must terminate in favor of the plaintiff, and malicious prosecution claims do not accrue until there is such a favorable termination. *Heck v. Humphrey*, 512 U.S. 477, 489-90 (1994).

504. In 2022, the United States Supreme Court held that a plaintiff bringing a malicious prosecution case pursuant to § 1983 merely needs to show that the underlying prosecution ended without a conviction, rather than that it ended with an "affirmative indication of innocence." *Thompson v. Clark*, 596 U.S. 36, 37 (2022).

505. On October 5, 2023, more than ten months after the severe abuse petitions were filed against Plaintiffs, DSS Defendants moved to withdraw the petitions. The family court dismissed the petitions against Plaintiffs that day.

### c. *Lack of Probable Cause*

506. The third element of a malicious prosecution claim is lack of probable cause to initiate the prosecution.

507. "In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" *Kurtz v. Hansell*, 664 F.Supp.3d 438, 452 (S.D.N.Y. 2023) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (internal citation omitted)).

508. To succeed on a malicious prosecution claim arising out of a civil prosecution, the "want of probable cause must be patent." *Emanuel v. Griffin*, 2013 U.S. Dist. LEXIS 142723, *25 (S.D.N.Y. Oct. 2, 2013) (quoting *Fink v. Shawangunk Conservancy, Inc.*, 15 A.D.3d 754, 755 (2005)).

509. Defendants knew that there was a lack of probable cause to bring the severe abuse petitions at the time of filing, yet did so anyway in clear disregard of Ms. Cabrera and Mr. Johnson's constitutional rights.

510. Because there was no direct evidence that anyone had intentionally harmed Empress, the severe abuse petition that DSS filed against Ms. Cabrera and Mr. Johnson relied on the circumstantial and speculative evidence of her presenting to the hospital with injuries that Defendants claimed could only have been caused by an act of abuse.

511. To bring a case of severe abuse, abuse, or neglect based on circumstantial evidence in New York family court, the petitioner must be able to make a prima facie case that the child suffered injuries that (1) ordinarily would not occur without the actions or omissions of

respondents, and (2) that the respondents were the caretakers at the time of the injury. Fam. Ct. Act § 1046(a)(ii). *See also, Matter of Philip M.*, 82 N.Y.2d 238, 243 (1993).

512.   In other words, the doctrine of *res ipsa loquitur* is invoked to shift the burden to the respondents to provide a non-abusive explanation for the injuries or establish that they were not the ones caring for the child at the time the child became injured.

513.   In this case, Defendants knew that they did not have probable cause to believe Ms. Cabrera or Mr. Johnson had abused Empress and, therefore, they presented a set of facts they knew to be false and deliberately misleading alleging that Empress's death was necessarily caused by intentional abuse and that her injuries occurred while in the exclusive care of her parents.

514.   First, Defendants knew when they filed the severe abuse petitions on December 27, 2022, that at the time Empress was first hospitalized on December 16, she tested positive for the flu, had been admitted to the hospital after experiencing protracted uncontrolled seizures, and did not have any subdural hematomas when she was initially subjected to a brain CT scan approximately two hours after she was last in her parents' exclusive custody.

515.   Defendants concealed this critical information and instead presented deliberately misleading and factually inaccurate information to support abuse charges.

516.   Defendants Golden, Spatenga, and Defilippis alleged that Empress had the following internal injuries on or about December 16, 2022: cervical cord edema, cervical ligamental edema, multiple retinal bilateral hemorrhaging as well as compression fractures to her vertebrae at the C6 and C7 vertebrae Tl and Tl. ...  subdural and subarachnoid hemorrhages, diffuse cerebral edema, cerebral tonsillar herniation and a scalp hematoma.

517. Upon information and belief, all information known to Defendant Spatenga was communicated to Defendant Defilippis as Defendant Defilippis swore in the petitions that she was "acquainted with the facts and circumstances of the above-entitled proceeding."

518. Defendants Golden, Spatenga, and Defilippis knew that the injuries listed in the petition were not present at the time Empress was hospitalized, but rather, developed in the following hours and days when she was being kept alive by life support and her brain was dying.

519. Defendants Golden, Spatenga, and Defilippis knew that Empress came to be hospitalized on December 16, 2022, after her mother, Plaintiff Cabrera, called 911 seeking help for her daughter who had become sick and began displaying concerning stiffening movements in the middle of the night.

520. Defendants Golden, Spatenga, and Defilippis knew that Nassau County Police Department emergency medical workers arrived at Plaintiffs' home in response to the Plaintiffs' 911 call at 5:40 a.m., and that the EMT's transported Empress to Nassau University Medical Center, arriving at 6:04 a.m.

521. Defendants Golden, Spatenga, and Defilippis knew that at the time Empress arrived at Nassau University Medical Center, she continued experiencing grand mal seizures and that emergency medical technicians had been attempting, in vain, to stabilize her and establish an airway prior to her admission.

522. Defendants Golden, Spatenga, and Defilippis knew that emergency medical providers were unable to establish an airway and that they placed her on a ventilator at 6:32 a.m.

523. Defendants Golden, Spatenga, and Defilippis knew that a CT scan taken at NUMC at 7:19 a.m. – more than an hour and forty minutes after Empress was last in the exclusive care of her parents – showed that she had no intracranial bleeding and the results were deemed "normal."

524. Defendants Golden, Spatenga, and Defilippis knew that the initial CT exam conducted on December 16, 2022, showed no evidence of any of the other findings alleged in the petition.

525. Defendants Golden, Spatenga, and Defilippis knew that Empress's clinical examination on December 16, 2022, confirmed she did not have any external signs of harm such as marks, bruises, or skull fractures suggestive of an impact event.

526. Defendants Golden, Spatenga, and Defilippis knew that Empress tested positive for Influenza A at NUMC.

527. None of the compelling and critical evidence known to Golden, Spatenga, and Defilippis – that Empress presented at NUMC on December 16, 2022, sick with the flu, had been suffering from uncontrolled seizures, had not been breathing for over an hour, and that a CT scan showed she had no intracranial injuries, fractures, or any external signs of trauma – was reflected in the petition.

528. Instead, Defendants Golden, Spatenga, and Defilippis presented a knowingly distorted account of Empress's condition by detailing medical findings that only developed during the hours and days *after* she was placed on life support, falsely suggesting that they all stemmed from injuries that occurred while in the exclusive care of her parents.

73

529. Defendants Golden, Spatenga, and Defilippis knew that by the time a subsequent CT scan was taken of Empress's brain at CCMC, she had been intubated and not breathing on her own for more than eight hours.

530. Defendant Golden knew that this second CT scan revealed evidence of diffuse cerebral edema and widespread hypoxic-ischemic injury, as the cerebellum was herniating into the upper cervical canal, which is the radiologic equivalent of brain death.

531. Defendant Golden knew that the results of this second CT scan showed a hyperdensity along the right occipital convexity that could potentially show a subdural hematoma, but did not conclusively indicate one.

532. Defendant Golden knew, or should have had substantial reason to suspect, that the hyperdensity was more likely a SWI, a magnified iron-related artifact, or evidence of de-oxygenated blood than a hematoma.

533. Defendant Golden knew, or should have known, that this hyperdensity was only visible on one sequence of the CT scan, and its presence was not corroborated on other sequences, suggesting that there was not in fact any subdural hematoma at all.

534. Defendant Golden knew, or should have known, that this finding of hyperdensity on one sequence was entirely explained by the massive hypoxic-ischemic brain injury, which Defendant knew followed seizures, collapses, resuscitation attempts, and subsequent brain death.

535. Moreover, Defendant Golden knew, or should have known, that this potential, albeit unlikely, subdural hematoma was not the type that would reasonably be expected to result from a shaking or traumatic brain event as it did not include any shearing of the bridging veins.

536. Defendants Golden, Spatenga, and Defilippis knew that no other internal injuries were visible on this second CT scan taken on December 16, 2022.

537. Defendants Golden, Spatenga, and Defilippis knew that it was not until subsequent MRI and CT imaging, performed between December 19, 2022, and December 21, 2022, that the additional alleged findings first presented.

538. On December 19, 2022, an MRI of Empress's spine confirmed she had suffered brain death as there was a clear hypoxic ischemic injury and tonsillar herniation.

539. This MRI also reportedly showed areas of increased STIR signal involving the C6, C7, T1, and T2 vertebral bodies that the radiologist suggested reflected minimal compression fractures; though, the MRI did not show evidence of a skeletal injury, and the STIR showed only minimal signal change consistent with downward herniation of the cerebellum.

540. Defendant Golden knew, or should have known, that these alleged injuries and the rest of the findings on the December 19, 2022, MRI were consistent with injuries that would ordinarily result from the progression of brain death over three days on life support.

541. Similarly, Defendant Golden knew, or should have known, that the alleged presence of bilateral retinal hemorrhages is also consistent with a hypoxic ischemic injury and is not necessarily an indicator of a traumatic event.

542. Certainly, Defendant Golden knew, or should have known, that the "cervical cord edema, cervical ligamental edema, diffuse cerebral edema, cerebral tonsillar herniation" were all evidence of a hypoxic ischemic injury, and consistent with not being able to breathe for a protracted period of time due to grand mal seizures – the well-documented event that caused Empress's hospitalization.

543. Yet, in the petition, Defendants Golden, Spatenga, and Defilippis presented these findings as all conclusively present – days before they were first allegedly detected – and necessarily the result of abuse, rather than the natural evolution of a brain that has died but is being maintained by life support.

544. Defendant County had a policy of not challenging or questioning conclusions reached by CAPs, even when they were aware of information that would undermine those conclusions.

545. Acting pursuant to that policy, Defendant Spatenga, and Defilippis included in the severe abuse petition that "according to the hospital" "the injuries were non-accidental trauma," and "consistent with a whipping back and forth motion of the child's head and neck."

546. Portraying such injuries to the Family Court as if they were necessarily and unquestionably caused by abuse was intentionally misleading and contrary to what Defendants Golden, Spatenga, and Defilippis knew to be true at the time of filing.

547. In addition to presenting false and misleading information about Empress's medical condition in the petition, Defendants Spatenga and Defilippis included information that she knew could not support a finding of neglect or abuse as they were allegations arising from prior reports that had already been deemed unfounded.

548. A report of alleged abuse or neglect is "unfounded" when the investigation into the report reveals no credible evidence to support the allegations. Soc. Serv. L. § 422(5).

549. Evidence from prior unfounded reports is not admissible to support a finding of abuse or neglect in a subsequent report. Soc. Serv. L. § 422(5)(b); *see also., M.P. v. Administration for Children's Services (In re A.P.),* 183 A.D.3d 535 (App. Div. 1st Dept., May

76

28, 2020); *Matter of Da'Shunna M.H. (Jefferson Cty. DSS v. Delbert W.H.)*, 2015 NY Slip Op 08600 (App. Div. 4th Dept., Nov. 20, 2015).

550. Defendants Spatenga and Defilippis knew that the allegations against Plaintiff Cabrera of inadequate guardianship and medical neglect of Empress – relating to an iron deficiency, a UTI, alleged inadequate nutrition related to hemp based formula and the supposed failure to properly follow up with medical professionals – had been reported to DSS on August 3, 2022, investigated, and deemed unfounded on October 5, 2022, yet she included those unfounded allegations in the petition to cast Plaintiffs in a negative light and to falsely suggest that Plaintiffs had a history of abusing or neglecting their children.

551. Similarly, Plaintiff Johnson had been the subject of a report regarding his older daughter A.J. in 2017, a report that was also investigated and deemed unfounded.

552. Despite knowing that this report had been unfounded, and that Plaintiff Johnson had no other reports of child neglect relating to his other children, Defendants Spatenga and Defilippis included information from his unfounded report in the severe abuse petitions against Plaintiffs, alleging: "The respondent father was also known to CPS for a case where he failed to get the appropriate medical attention for another of his children and in that case that other child had nutrition issues because of what the respondent father fed that child."

553. Based on the foregoing, Defendants knew at the time the petitions were filed that the medical findings allegedly supporting an abuse determination did not arise while in the exclusive care of Plaintiffs, were not necessarily caused by abuse, and as such, they did not have probable cause to support a prosecution premised on a theory of *res ipsa loquitur*.

554. Defendants Spatenga and Defilippis also included allegations from unfounded reports for the sole purpose of prejudicing the court as they knew such allegations could not support a finding of abuse or neglect.

555. As a result, Defendants leveled allegations that were knowingly false, deliberately misleading, and calculated to obtain a finding of severe abuse, in the absence of probable cause to believe Plaintiffs abused Empress.

   d. *Continued Prosecution After Any Conceivable Claim of Probable Cause was Vitiated*

556. On August 2, 2023, more than seven months after the petitions had been filed and Plaintiffs had been separated from Infant Plaintiffs, Dr. Prochilo of the New York City Office of Chief Medical Examiner issued her final comprehensive autopsy report that listed the cause of death to be "complications of multiple infections including Influenza A and bacterial urinary tract infection," and that her manner of death was "natural."

557. The autopsy report confirmed that Empress's brain injuries were not the result of trauma, but rather were the result of the global hypoxic ischemic event following the seizures, and that the small occipital subdural hematoma was a result of an enhanced reaction to the body's immune system.

558. Additionally, instead of finding widespread bilateral retinal hemorrhages, the autopsy report indicates that the neuropathologist found there were rare "possible" retinal petechial hemorrhages that could not be confirmed on microscopy.

559. The neuropathologist described these as "congested retinal vessels" and found "no hemorrhage in either eye."

560. These findings conclusively proved that Empress's death was not caused by abuse and that her parents had been wrongfully accused of SBS.

561. To the extent that there was any doubt in Defendant Golden's or Spatenga's minds as to the cause of Empress's death, any such doubt was eliminated after the medical examiner's results were released.

562. Still, Defendants Golden and Spatenga took no action to update the Court or County or to amend the allegations of abuse following the release of the exonerating autopsy report.

563. Rather, Defendant Golden worked to develop reports to undermine the medical examiner's findings and suggest that Empress's death had, indeed, been caused by abusive trauma despite the overwhelming evidence to the contrary.

564. Meanwhile, Plaintiff Cabrera's children remained separated from her.

565. Defendant County had a policy of not requiring caseworkers to amend or withdraw petitions they know to be false or to take corrective action if they learn there is no probable cause.

566. Acting pursuant to that policy, Defendant Spatenga continued the prosecution of Plaintiffs in Nassau County Family Court for months after the initial autopsy results negated the medical evidence Defendants relied upon, and for two months after the issuance of the final autopsy report.

567. Defendant Spatenga willfully and maliciously commenced and continued the severe abuse charges without probable cause, legal justification or excuse, and for reasons other than the pursuit of justice.

568. It was not until October 5, 2023, more than two months after the medical examiner's results were released, that the County took action to withdraw the petitions against Plaintiffs.

*e. Actual Malice*

569. Initiating a prosecution without "probable cause generally raises an inference of malice sufficient to withstand summary judgment." *Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir. 1996).

570. As set forth above, Defendants willfully brought severe abuse petitions against Plaintiffs based on allegations they knew to be false, misleading, and inadmissible.

571. Defendants alleged that Plaintiffs abused Empress despite knowing that her death was likely the result of natural causes as she came into the hospital with uncontrolled seizure activity in the context of testing positive for the flu.

572. Defendants Spatenga and Defilippis also included allegations from reports they knew to be unfounded for prejudicial purposes.

573. Moreover, even after the autopsy results confirmed that Empress's death was not caused by abuse, Defendants took an unreasonable amount of time – more than two months – to formally withdraw the severe abuse petitions against Plaintiffs.

574. As such, an inference of actual malice is amply justified in this case.

*a. Plaintiffs Suffered Lost Liberty as a Result of the Malicious Prosecution*

575. Ms. Cabrera's and Mr. Johnson's constitutional rights are sufficiently implicated to allow them to bring these malicious prosecution claims.

576. In the same charging document that Defendants used to bring the false severe abuse, abuse, and neglect allegations against Plaintiffs, Defendants requested that Plaintiff Cabrera's four children, Infant Plaintiffs, be removed from her care.

577. The family court granted that relief, and Plaintiff Cabrera lost custody of her four children, and remained separated from them, for nearly ten months until the County finally moved to dismiss the cases against both Plaintiffs.

578. On December 22, 2022, when the Defendants first presented the case, the family court judge granted Defendants' request and placed all four children in their grandmother's care, entering full stay-away orders of protection against Plaintiff Cabrera that prohibited any contact with her children except for supervised visits as approved by the Department of Social Services.

579. Similarly, the family court entered full stay-away orders of protection against Plaintiff Johnson prohibiting any contact with his stepchildren, other than supervised visits as approved by the Department of Social Services.

580. Though DSS arranged for supervised visitation between Plaintiff Cabrera and her children while the case was pending in family court, it barred any contact between Plaintiff Johnson and his stepchildren during that time.

581. Plaintiff Johnson attended his daughter Empress's funeral on January 6, 2023, only after obtaining special permission from the family court judge, who modified the order of protection and permitted Johnson to attend the funeral so long as a DSS caseworker was present to supervise any contact with the Infant Plaintiffs.

582. For more than eight months, Plaintiff Cabrera was only allowed visits with her children when supervised by her mother. On September 11, 2023, more than one month after the final autopsy report had concluded that Empress died of natural causes and not abuse, the Court modified the orders of protection from full stay-away orders to limited orders of protection, allowing the children to be returned home to their mother's care.

583. The orders of protection that were entered on September 11, 2023, prohibited Plaintiff Johnson from being alone with the children.

584. The orders of protection were vacated when the severe abuse petitions were ultimately dismissed on October 5, 2023.

585. Between the date the petitions were filed and the date they were dismissed, Plaintiff Cabrera and Johnson were required to attend numerous court appearances and comply with supervision by DSS caseworkers.

586. As such, the liberty interests of Plaintiffs are sufficiently implicated by the civil proceeding to support a claim for malicious prosecution.

<div align="center">

**SECOND CAUSE OF ACTION**
Violation of Plaintiffs' Right to a Fair Trial
Under the Fourteenth Amendment and 42 U.S.C. Section 1983
*Against All Defendants on Behalf of Plaintiffs Cabrera and Johnson*

</div>

587. Plaintiffs repeat and reallege each and every allegation set forth above.

588. The Fourteenth Amendment protects the right to receive a fair trial, free from the presentation of false evidence.

589. When an investigator fabricates information that is likely to influence a trier of fact's decision, forwards that information to prosecutors, and it results in the plaintiff suffering a deprivation of life, liberty or property, the investigator violates the plaintiff's right to a fair trial. *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).

590. This right applies to civil proceedings that result in a deprivation of liberty as well as criminal ones. *See, Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) ("We think the right at issue in this case is appropriately identified as the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.").

591. Though caseworkers investigating allegations of abuse are granted "unusual deference," such deference does not permit them to trample the constitutional rights of the families they investigate by "ignoring overwhelming exculpatory information or by manufacturing false evidence." *Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999).

592. Accordingly, parents who are subjected to the use of fabricated evidence against them in abuse and neglect proceedings may pursue fair trial claims when they are deprived of liberty as a result of such fabrications. *See e.g.*, *Cook v. City of New York*, 243 F.Supp. 3d 332, 353 (E.D.N.Y. 2017) (granting plaintiffs' motion to amend the complaint to add a fabrication of evidence and fair trial claim against ACS officers).

593. Having a child removed from a parent's care – and the threat of continued loss of custody – is the type of liberty deprivation that supports a fair trial claim. *See Zubko-Valva v. Cnty. Of Suffolk*, 607 F.Supp. 3d 301, 315 (E.D.N.Y. 2022) (denying a motion to dismiss plaintiff's fair trial claim where CPS workers fabricated evidence that caused a temporary loss of parental rights).

594. Like malicious prosecution claims, fabricated evidence claims accrue only upon the termination of the prosecution in the plaintiff's favor. *McDonough v. Smith*, 588 U.S. 109, 119-20 (2019).

595. As set forth in the Malicious Prosecution cause of action, *supra*, Defendants acted under color of state law to violate Ms. Cabrera's rights to a fair trial by knowingly presenting false and glaringly incomplete information to prosecutors who filed a severe abuse case against her, which predictably led to the removal of Infant Plaintiffs from her care for ten months.

596. As set forth in the Malicious Prosecution cause of action, *supra*, the information contained in the abuse petitions was false and deliberately misleading.

597. The petition falsely and unequivocally alleged Empress suffered subdural and subarachnoid hemorrhages, yet Defendants knew that CCMC radiologist only noted a possible 3mm hyperdensity that could be consistent with a small hematoma – a qualified finding that was never confirmed and was contradicted by the negative NUMC CT scan performed hours after Empress was last in her parents' exclusive care.

598. These fabrications and related omissions caused the family court judge to have an inaccurate and incomplete picture of the potential causes of Empress's death and made the likelihood of natural death seem implausible.

599. Ms. Cabrera's fair trial claim is timely as it accrued on October 5, 2023, upon the dismissal of the family court severe abuse petitions.

600. As a result of Defendants' fabrications and omissions, the family court judge removed Infant Plaintiffs from their mother's care.

601. Had the medical examiner's report not conclusively confirmed the natural cause of Empress's death, and had the matter not ultimately been withdrawn by DSS, Ms. Cabrera would have been at risk of continued prosecution based on the fabricated claims included in the petition Defendants filed against her, which could have resulted in a finding of severe abuse which would potentially have led to her permanent loss of custody of her children.

602. A finding of severe abuse would also have caused Ms. Cabrera's name to remain on the State Central Register of Abuse and Maltreatment, which would have presented a barrier to employment in many fields.

603. As such, Defendants' presentation of misleading and fabricated evidence deprived Ms. Cabrera of the custody of her children for ten months, and placed her at risk of losing custody permanently, as well as all the collateral consequences of a finding of abuse.

604. As a result of Defendants' wrongful conduct, Ms. Cabrera suffered severe emotional damages.

### THIRD CAUSE OF ACTION
Violation of Plaintiff's Right to the Care, Custody, and Management of Her Children
Under the Fourteenth Amendment and 42 U.S.C. § 1983
*Against All Defendants on Behalf of Plaintiff Cabrera*

605. Plaintiffs repeat and reallege each and every allegation set forth above.

606. Defendants – state child welfare investigators – violated Plaintiff Cabrera's right to care for her four older children, Infant Plaintiffs, by presenting a knowingly distorted assessment of Empress's medical condition to support a finding that Plaintiffs had caused her death by violently shaking her.

607. By concealing critical exculpatory evidence, falsely and unreasonably portraying with certainty that Empress's injuries were caused by intentional trauma, and including information from prior unfounded reports of abuse or neglect, DSS Defendants painted Plaintiffs as dangerous and violent, which predictably ensured that their application to remove Empress's siblings from her mother's care would be granted.

608. "Choices about marriage, family, life, and the upbringing of children are among the associational rights [the Supreme] Court has ranked as 'of basic importance in our society,' … rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) (internal citation omitted).

609. Courts have therefore long recognized parents' "fundamental liberty interest protected by the Fourteenth Amendment" in the "care, custody and management of their child[ren]." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (quoting *Santosky v. Kramer*, 455 U.S. 745, 743 (1982)).

610. Indeed, the right to family integrity is a "substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999).

611. Parents may bring substantive due process claims when their children are wrongly removed from their care and such removal "'would have been prohibited by the Constitution even had the [parents] been given all the procedural protections to which they were entitled.' In other words, while a procedural due process claim challenges the procedure by which a removal is effected, a substantive due process claim challenges the 'fact of [the] removal] itself.'" *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2011) (quoting *Tenenbaum*, 193 F.3d at 600, and *Bruker v. City of N.Y.*, 92 F.Supp 2d 257, 266-67 (S.D.N.Y. 2000)).

612. Though brief removals or separations of parents and children have been found insufficient to trigger a substantive due process claim, when the separation is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," the government violates the parent's and child's substantive due process rights. *See Southerland*, 680 F.3d at 152-53.

613. Defendants' actions, which removed Infant Plaintiffs from their mother and stepfather for nearly ten months, were so egregious that they violated Plaintiff's substantive due process rights.

614. Though the removal was court-ordered, as discussed *supra*, the issuance of the removal order was secured by presenting knowingly misleading information about Empress's injuries and the timing and causes of such injuries which presented a distorted picture of abuse.

615. Defendants also intentionally withheld from the family court critical information about Empress's flu infection and the first head CT scan results, which showed no signs of trauma, to misrepresent confidence in the abuse diagnosis and secure the removal of the children.

616. Defendants also improperly presented allegations from prior unfounded neglect reports, further prejudicing the family court judge against Plaintiffs.

617. Defendants even went so far as to continue the prosecution and efforts to maintain the family separation following the final results of the medical examiner, which conclusively showed Empress's death had been the result of tragic natural circumstances and not abuse.

618. This final act, of maintaining family separation for over two months after receiving a conclusive, exonerating autopsy report, elevates the conduct from merely incorrect or negligent to "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).

619. This continuation served no legitimate child-protective purpose and could only be motivated by a desire to justify the initial mistake or by malice.

620. As such, Defendants violated Ms. Cabrera's substantive due process rights to maintain care and custody of her four children.

621. As a result of Defendants' actions, Ms. Cabrera suffered extreme emotional distress and mental anguish at being separated from her children.

## FOURTH CAUSE OF ACTION
### Violation of Infant Plaintiffs' Rights to Family Integrity
### Under the Fourth Amendment and 42 U.S.C. §1983
*Against All Defendants on Behalf of Infant Plaintiffs*

622.    Plaintiffs repeat and reallege each and every allegation set forth above.

623.    Courts have long recognized that the "right to preservation of family integrity encompasses the reciprocal rights of both parent and children." *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977).

624.    Just as parents have the right to care for their children without unjust governmental interference, children have a "parallel constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily family association." *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000).

625.    When children are unnecessarily and unjustly removed from their parents, they may have separate cognizable constitutional claims. *Southerland, supra*, 680 F.3d at 142.

626.    Unlike their parents, children's substantive due process rights to familial association fall under the Fourth Amendment (as opposed to the Fourteenth Amendment), *Southerland*, 680 F.3d at 142-143, as their removal from their homes is considered a "seizure" under the Fourth Amendment. *Tenenbaum, supra*, 193 F.3d at 600.

627.    Even if there is probable cause to support the initial removal of a child, a child may not be permitted to languish in foster care if he can be safely returned home. Fam. Ct. Act § 1028(a) (requiring children who have been legally removed from their homes to be returned to their parents unless "the return presents an imminent risk to the child's life or health[.]"); *see also Nicholson* v. Scoppetta, 3. N.Y.3d, 357, 378 (2004) (The New York Court of Appeals has clarified this standard is only met when that imminent risk cannot be mitigated by

88

court orders and that risk is not outweighed by the risks attendant to removing a child from his home).

628. As such, a seizure that is initially constitutionally permissible may become impermissible if the child is detained in foster care for an unnecessary or unjust period of time.

629. This is analogous to criminal detentions: when officers obtain clearly exculpatory evidence after conducting a lawful arrest, they have an obligation to act on such evidence to end the unnecessary and wrongful detention. *Russo v. City of Bridgeport*, 479 F.3d 196, 205 (2d Cir. 2007).

630. When they fail to take such action causing the individual to remain detained after probable cause has dissipated, the officers may be subject to suit under Section 1983 for violating the individual's Fourth Amendment right to be free from wrongful *prolonged* detention. *Russo*, 479 F.3d at 205-207.

631. In this case, Infant Plaintiffs were seized on December 22, 2022, and not allowed to return home to their mother until September 11, 2023.

632. Their detention, though approved by a judge, was secured based on the deliberately misleading and inaccurate information presented by Defendants Spatenga, Defilippis, and Golden.

633. As a result the Infant Plaintiffs were subject to a wrongful seizure in violation of their Fourth Amendment rights.

634. Eight months after the initial wrongful removal, Defendants Spatenga and Golden received the clearly exculpatory medical examiner's report, confirming that Empress's death resulted from natural causes and not from abuse.

635. Though Defendants were in possession of this comprehensive report confirming that the clinical findings of bilateral retinal hemorrhages and spinal fractures did not exist, and that the injuries that Empress did have resulted from her medical conditions, they failed to take swift and appropriate action to secure the release the Infant Plaintiffs to their mother.

636. Indeed, these Defendants sought to maintain the removal of Infant Plaintiffs from their mother for nearly two more months by working to discredit and undermine the reliability and significance of the conclusive post-mortem report.

637. Defendants' actions were patently unreasonable under the circumstances.

638. As a result, Infant Plaintiffs suffered prolonged lost liberty for an additional two months after any arguable probable cause had surely dissipated.

639. This deprivation also caused Infant Plaintiffs considerable emotional distress, mental anguish, depression, and anxiety.

**FIFTH CAUSE OF ACTION**
Violation of Plaintiff's Right to Due Process Before Subjecting Her Child to an Unnecessary
Medical Examination for Investigative Purposes
Under the Fourteenth Amendment and 42 U.S.C. Section 1983
*Against Defendant Spatenga on Behalf of Plaintiff Cabrera*

640. Plaintiffs repeat and reallege each and every allegation set forth above.

641. When children are subjected to medically unnecessary examinations at the behest of state actors, without parental consent or court order, the rights of the parents and children are violated.

642. These examinations violate the parent's right to the care, custody and management of their child. "[T]hough not 'beyond limitation,' [this right] includes a significant decision-making role concerning medical procedures sought to be undertaken by state authority

90

upon their children." *Van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 867 (2d Cir.1990) (quoting *Santosky v. Kramer*, 455 U.S. 753 (1982) and *Prince v. Massachusetts*, 321 U.S. 158 (1944)).

643. For that reason, the Second Circuit held more than thirty-five years ago, that "the Constitution assures parents that, in the absence of parental consent, x-rays of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances." *Van Emrik*, 911 F.2d at 867.

644. Nearly ten years later, the Second Circuit reaffirmed that subjecting children to medically unnecessary examinations without parental permission or court order violates her parents' rights under the Fourteenth Amendment. *Tenenbaum v. Williams*, 193 F.3d 581, 598 (2d Cir. 1999).

645. *Van Emrik* and *Tenenbaum* stand for the proposition children may not be subjected to investigatory medical examinations in the course of abuse investigations without court order or parental consent. *L.B. v. City of New York*, 2025 U.S. LEXIS 45105, *23-24 (E.D.N.Y. March 12, 2025).

646. M.S. was removed from Ms. Cabrera pursuant to a court order on December 22, 2022, and temporarily placed in the care of her maternal grandmother.

647. Even though M.S. had been removed from Ms. Cabrera's care, Ms. Cabrera's parental rights had not been terminated, and as such, she retained the right to make medical decisions on behalf of her child.

648. Defendant Spatenga violated Plaintiff Cabrera's right to due process before subjecting her three-year-old daughter, M.S., to a medically unnecessary full skeletal x-ray examination, without parental permission or court order.

649. The skeletal survey was conducted at the behest of Defendant Spatenga, in that on December 30, 2022, Defendant Spatenga contacted Infant Plaintiffs' pediatrician to request that M.S. be referred for a skeletal survey during her well child visit on January 3, 2023.

650. Upon information and belief, the purpose of the full skeletal survey was to determine if M.S. had any evidence of old or healing fractures or injuries.

651. Upon information and belief, the purpose of conducting a skeletal survey was to investigate allegations of abuse, and not for any medical or treatment purposes.

652. On January 3, 2023, M.S. had a well child visit where there were no concerns raised about her health or physical condition, which M.S.'s pediatrician communicated to Defendant Spatenga.

653. Nevertheless, at the request of Defendant Spatenga, M.S.'s pediatrician provided M.S.'s temporary guardian, her grandmother, with a prescription for M.S. to have a skeletal survey conducted.

654. Ms. Spatenga did not seek nor did she obtain judicial authority in the form of a court order for the skeletal survey to be conducted on M.S.

655. Neither Ms. Spatenga, nor anyone else from DSS, contacted Plaintiff Cabrera about this examination, nor did anyone ask her permission before subjecting M.S. to the skeletal survey.

656. Ms. Cabrera only learned that M.S. was being subjected to a skeletal survey when her mother told her she had been instructed by DSS to bring M.S. to have the skeletal survey conducted.

657. On January 4, 2023, M.S. was subjected to a full skeletal x-ray.

658. The results of that survey were negative, meaning that there were no signs of injuries, acute or healing.

659. As a result, Plaintiff Cabreara suffered a violation of her Fourteenth Amendment right to make medical decisions which caused her mental distress.

## SIXTH CAUSE OF ACTION
Violation of M.S.'s Right to be Free From Unreasonable Searches
Under the Fourth Amendment and 42 U.S.C. Section 1983
*Against Defendants Spatenga on Behalf of Infant Plaintiff M.S.*

660. Plaintiffs repeat and reallege each and every allegation set forth above.

661. The Fourth Amendment ensures the right to be secure in one's person and prohibits state actors from conducting forceful removals and unreasonable searches of persons, including minors. "Even a brief seizure is a serious intrusion upon the sanctity of the person." *United States v. Langer*, 958 F.2d 522, 524 (2d Cir. 1992).

662. The Second Circuit has held that when medical "procedures undertaken at the initiative of a state official serve primarily an investigative function […] the Fourth Amendment and bodily integrity interests of the child are impacted." *McLoughlin* 2019 U.S. Dist. at *24 (citing *Van Emrik v. Chemung County Dep't of Social Services*, 911 F.2d 863, 867 (2d Cir. 1990)).

663. As such, subjecting a child to a medical examination for the purposes of investigating claims of child abuse violates the child's Fourth Amendment right to be free from warrantless searches. *Tenenbaum*, 193 F.3d at 606.

664. In the absence of a court order, "in order for the examination to have been constitutional, reasonable or probable cause or exigent circumstances justifying an emergency examination must have existed at the time the examination was performed." *Id.*

665. On January 4, 2023, M.S. was subjected to a full skeletal survey without court order or parental permission.

666. Upon information and belief, the skeletal survey was conducted at the behest of Defendant Spatenga.

667. Upon information and belief, the skeletal survey did not serve any treatment purposes and was instead requested to investigate allegations of abuse or neglect.

668. The results of that survey were negative, meaning that there were no signs of injuries, acute or healing.

669. As a result, Infant Plaintiff M.S. suffered a violation of her Fourth Amendment right to be free from unlawful search, as well as the unnecessary exposure to harmful radiation.

WHEREFORE, Plaintiff Cabrera on behalf of herself and her infant children M.S., S.S., N.M. and L.B., and Plaintiff Johnson demand judgment against the above-captioned Defendants as follows:

a. For compensatory damages, jointly and severally, in an amount to be determined at trial;

b. For punitive damages, jointly and severally, in an amount to be determined at trial;

c. For reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d. For pre- and post-judgment interest as allowed by law; and

e. For such other relief as this Court deems just and proper.

Dated: New York, New York
October 17, 2025

<div style="margin-left:40%">

WERTHEIMER FLEDER LLP

By: _____
Mara Fleder
Joel A. Wertheimer
14 Wall Street, Suite 4C
New York, New York 10005
(646) 720-1098
(646) 344-4212
mara@wfllp.com
joel@wfllp.com

</div>